THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID YOUNGERMAN, Defendant-Appellant.

First District (5th Division)   No. 1—04—1211

Opinion filed October 21, 2005.

TULLY, J., dissenting.

Edwin F. Mandel Legal Aid Clinic, of Chicago (Mark J. Heyrman, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Defendant appeals from an order of the circuit court of Cook County which denied his motion for discharge or conditional release from the custody of the Illinois Department of Human Services (the Department). The order was entered after we remanded to the circuit court in *People v. Youngerman*, 342 Ill. App. 3d 518 (2003). On appeal defendant maintains that the trial court's ruling was manifestly erroneous and in violation of his due process rights. We affirm.

## BACKGROUND

In 1985, defendant was charged with attempted murder, armed violence and aggravated battery for slashing his father's throat. He eluded arrest and lived for three years as a fugitive. On March 7, 1989, defendant was found not guilty by reason of insanity (NGRI). He was in need of inpatient mental health treatment and remanded to the Elgin Mental Health Center (Elgin) for a period of 30 years. Approximately 14 months after being admitted to Elgin, defendant eloped or escaped from Elgin on May 23, 1990. On March 15, 1994, defendant voluntarily surrendered himself and was admitted to Chester Mental Health Center.

Defendant filed his petition for discharge or conditional release on December 14, 2000. On February 6, 2001, the State filed a motion to amend the defendant's *Thiem* date to reflect the time when defendant had eloped from the Elgin treatment facility. The *Thiem* date refers to the date marking the end of the maximum period of defendant's involuntary commitment. We addressed the issue of amending defendant's *Thiem* date in *People v. Youngerman*, 342 Ill. App. 3d 518 (2003).

After a hearing on the defense petition and the State's motion to amend, the circuit court denied defendant's petition and granted the State's motion to amend defendant's *Thiem* date. On appeal, we affirmed the circuit court order amending the *Thiem* date; however, we remanded to the circuit court with instructions to set defendant's *Thiem* date as October 2, 2006. *Youngerman*, 342 Ill. App. 3d at 529-30. We also reversed the circuit court's denial of defendant's petition for discharge, finding that the court erred when it denied defendant's request for an independent psychiatric examination. *Youngerman*, 342

Ill. App. 3d at 530. We directed the circuit court to order an independent examination and conduct a hearing on defendant's petition within 120 days. *Youngerman*, 342 Ill. App. 3d at 530. On remand, the circuit court held a rehearing during which four expert witnesses testified.

## HEARING TESTIMONY

The first witness to testify was Dr. Stephen Dinwiddie, who had served as the medical director at Elgin Mental Health Center for five years. At the time of his testimony he was a professor of psychiatry at the University of Chicago. Dr. Dinwiddie reviewed prior psychiatric evaluations, psychological reports, and reports from treating professionals and he conducted a personal interview with the defendant. Dr. Dinwiddie testified defendant no longer satisfied the diagnostic criteria for paranoid schizophrenia, the diagnosis at the time of his acquittal by reason of insanity. Dr. Dinwiddie diagnosed defendant as having Asperger's syndrome, which the doctor described as a developmental disorder characterized by profound difficulties in picking up and responding to social cues, difficulties in social interaction, and difficulties in behaving with appropriate degrees of empathy. Dr. Dinwiddie testified that the treatment for Asperger's syndrome can be accomplished on an outpatient basis. Dr. Dinwiddie testified that, in his opinion, the defendant did not meet any of the criteria for delusional disorder. Dr. Dinwiddie stated the defendant previously suffered from delusions; however, his current beliefs are not delusional.

Dr. Dinwiddie also testified that he discussed with defendant the letters defendant had written to J.B., a female staff member at Elgin. Defendant communicated that he found the female staff member attractive and that he sought a "loving, supportive relationship" with her. He believed at "Elgin, forces beyond our control were against me." In response to questioning by Dr. Dinwiddie, defendant stated that he would be a "good choice for her to enter into a relationship with, because she kind of likes me, but she may not be sure." Defendant suggested to Dr. Dinwiddie that although he would be opposed to a court-ordered condition of no contact, he would follow any limits on contact expressed by J.B. The defendant was told to stop contacting J.B. The defendant told Dr. Dinwiddie that he thought he could cause a few problems in J.B.'s marriage. Dr. Dinwiddie testified that he considered defendant's discussion of his love for J.B. to be an inappropriate and unrealistic perception of his relationship with her.

Dr. Dinwiddie testified that in his opinion defendant is not in need of continued inpatient mental health treatment. Dr. Dinwiddie stated that defendant has no specific symptoms which can be treated with

medications and his condition may be treated on an outpatient basis. Dr. Dinwiddie was of the opinion that based on defendant's nonviolent record since he cut his father's throat in 1985, as well as defendant's ability to behave nonviolently in a variety of settings, the likelihood of defendant acting violently is low. Dr. Dinwiddie further opined the defendant was not reasonably expected to inflict serious physical harm on himself or upon anyone else.

The next witness to testify was Dr. Kanwal Mahmood, who was defendant's treating psychiatrist from December 1999 to November 2001. Dr. Mahmood testified that during the time she treated defendant, she did not see any signs of a major mental illness. She stated the defendant did not have paranoid schizophrenia nor did he suffer from a delusional disorder. During the two years Dr. Mahmood treated defendant, he never took any medications, never required seclusion or restraint, and never harmed anyone at the facility.

Dr. Mahmood testified that during the time she was treating defendant she diagnosed him with personality disorder, persecutory and grandiose type. Dr. Mahmood explained that this is a mental illness characterized by suspicious, guarded and paranoid behavior. She further explained that the defendant had never accepted that anything was wrong with him and he never accepted the therapy and coping skills offered to him. Dr. Mahmood explained that defendant had a sense of entitlement; that whatever he wants, he wants at that time and on his terms. She had doubts about the defendant's ability to cope because he has never accepted that he needs help.

Dr. Mahmood opined that the defendant does not appreciate the harm that he did to his father in 1985. She explained that he verbalized that he should not have done it, but that he is resistant to expressing his feelings about the incident. Dr. Mahmood stated that defendant has inadequacies in expressing himself and avoids people with whom he is angry.

At the time of the hearing, Dr. Mahmood had a new diagnosis for the defendant, pervasive developmental disorder. Dr. Mahmood explained that she had the opportunity to review more of the defendant's medical records that were not available when she was treating him. She reviewed records of a psychiatric evaluation done by Dr. Dinwiddie from 1994 to 1996 as well as records from Dr. Flippen and childhood records. Dr. Mahmood testified that, in her opinion, defendant currently suffers from pervasive developmental disorder. She explained that this is a mental illness characterized by deficits in social activities, communicating and speech. Dr. Mahmood further explained that persons with pervasive developmental disorder are obsessive and fixate on things.

Dr. Mahmood testified that in her opinion, defendant was in need of inpatient care. She explained that defendant's plan to get a Ph.D., as well as his belief that he could cause problems in J.B.'s marriage, the female staff member employed by Elgin, were part of the grandiose aspect of his personality disorder. She further explained that defendant also exhibited persecutorial aspects of his mental illness. For example, the defendant believed that doctors were working against him and that his public defender and the judge were conspiring against him at his hearing in 2001. Dr. Mahmood also stated that defendant had a sense of entitlement which was exhibited in his making unrealistic requests and insisting on immediate gratification of those requests without understanding the situation.

Dr. Mahmood was concerned that, if released, defendant would seek readmission to graduate school and the stress of this process might cause him to decompensate. Dr. Mahmood also believed defendant would be at risk of developing psychosis and a propensity for violence if he did not achieve the financial, academic and professional goals he identified in his letter to J.B. Dr. Mahmood testified that based on defendant's history of violence in 1985, his mental illness, and "stressors" such as lack of financial stability, she believed it reasonable to expect the defendant to inflict serious harm upon himself or upon another.

The next witness to testify was Dr. Sanghee Kim-Ansbro, a psychiatrist at the Alton Mental Health Center. Dr. Kim-Ansbro was defendant's treating psychiatrist for three months before his transfer to another facility in January 2004. Dr. Kim-Ansbro testified that at the time she treated defendant, he did not have paranoid schizophrenia or delusional disorder and did not exhibit any symptoms of psychoses.

At the hearing, Dr. Kim-Ansbro diagnosed defendant with a personality disorder with paranoid and narcissistic features and grandiose behavior. Dr. Kim-Ansbro testified that under stress, the paranoid and narcissistic features of defendant's personality disorder could make the defendant suspicious, paranoid and psychotic. She also opined that defendant could become violent should he be terminated from a graduate program or be rejected by the "girl of his dreams."

Dr. Kim-Ansbro felt that defendant has not been violent because he has been living in a setting where his actions "are at least somewhat limited and controlled," and that he was unlikely to be impulsively violent. According to Dr. Kim-Ansbro, defendant planned the 1985 attack on his father. Reportedly, defendant intended to attack both his mother and father, but changed his plan at the time of the attack. Defendant provided no warning to his father before the attack. Dr. Kim-Ansbro believed that under stress, defendant's personality

disorder could cause him to become psychotic, suspicious and increasingly paranoid. Dr. Kim-Ansbro believed defendant could become violent should he be terminated from a graduate program or be rejected by J.B.

Dr. Kim-Ansbro testified that she believed defendant would not do well on an outpatient basis because he does not have the coping skills to enable him to seek help. Dr. Kim-Ansbro explained that the defendant believed mental illness was a concept invented to lock up and oppress people. She further noted that defendant declined to participate in therapy and placed little value in the opinions of the doctors. Dr. Kim-Ansbro explained the importance of this in evaluating how defendant would cope outside the hospital. The fact that defendant had not responded violently to his doctors and therapists telling him that his plans and goals were unrealistic did not show that he could cope with failure and rejection. Dr. Kim-Ansbro explained that defendant simply did not believe the doctors. Her concern was that when the defendant was actually confronted with rejection or failure, when his narcissism was challenged, he would not be able to cope and would be prone to violence.

The final witness was Dr. Carol Flippen. Dr. Flippen is a staff psychiatrist employed by Forensic Clinical Service of Cook County. Dr. Flippen conducted an independent evaluation of the defendant utilizing records relating to his childhood, the incident crime, and his behavior while hospitalized. She also interviewed the defendant for two hours on November 6, 2003.

Dr. Flippen testified that the nature of defendant's mental illness was a delusional disorder, persecutorial type, and personality disorder with narcissism and antisocial behavioral traits. She also diagnosed defendant with pervasive developmental disorder, not otherwise specified. Dr. Flippen opined that the delusional disorder and personality disorder were more important to the potential dangerousness of the defendant than the developmental disorder.

Dr. Flippen believed that defendant, if released from an inpatient setting, was reasonably expected to inflict serious physical harm upon himself or another. Dr. Flippen stated that defendant has had persecutorial delusions since at least 1985. She explained that in 1985 these delusions related to his father and included his belief that his father was trying to make life difficult for him. The defendant continues to exhibit this symptom as he indicated to Dr. Flippen that there are people who are trying to make his life more difficult, including people in the public defender's office, people at Elgin and Alton Mental Health Centers, and the judge who denied his last request for release.

Dr. Flippen also testified that defendant has a potential for

dangerousness because he does not have an understanding or appreciation of his mental illness. Dr. Flippen explained that defendant has never believed that he has a mental illness and has never acknowledged the benefit of therapy. Thus, once defendant is out of the hospital setting he would not recognize the symptoms of his illness and would not seek treatment.

Defendant reported to Dr. Flippen that if he were released from an inpatient setting, he would attempt to return to graduate school to attain a Ph.D. He also reported that he believed he would not have to pay tuition. These statements were significant according to Dr. Flippen because such circumstances would put defendant in a situation similar to his situation when he attacked his father. The stress defendant would experience could inflame his narcissistic traits and trigger an episode of psychosis. According to Dr. Flippen, if defendant were released from an inpatient setting he would reasonably be expected to inflict serious physical harm on himself or another.

Following the testimony, the circuit court found the evidence clearly and convincingly demonstrated the defendant was mentally ill and that he was reasonably expected to inflict serious physical harm upon himself or another. Accordingly, the court denied defendant's petition for discharge or, in the alternative, conditional release.

On appeal defendant argues the decision of the trial court was against the manifest weight of the evidence and violated due process. The defendant maintains that since 1985, he has not demonstrated any violent or aggressive behavior and is not a danger to himself or others. The defendant contends the opinions of Drs. Mahmood, Kim-Ansbro and Flippen were inconsistent with their testimony regarding his behavior. We take each argument in turn.

## ANALYSIS

■ The Unified Code of Corrections provides that an order authorizing involuntary commitment is appropriate when a defendant has been found not guilty by reason of insanity, is mentally ill, and because of his mental illness, "is reasonably expected to inflict serious physical harm upon himself or another in the near future." 730 ILCS 5/5—2—4(a)(1)(A)(i) (West 2002). Regarding the issue of whether a defendant is appropriate for conditional release, section 5—2—4(g) of the Unified Code provides that "[t]he findings of the Court shall be established by clear and convincing evidence." 730 ILCS 5/5—2—4(g) (West 2002). The Code further provides, "[t]he burden of proof and the burden of going forth with the evidence rest with the defendant." 730 ILCS 5/5—2—4(g) (West 2002).

It is within the province of the trier of fact to consider the evidence

and decide the weight to be afforded it and resolve evidentiary conflicts. *People v. Hoffmann*, 140 Ill. App. 3d 1056, 1065 (1986). The trial court's decision is given great deference and, providing it is not against the manifest weight of the evidence, will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently. *In re Moore*, 301 Ill. App. 3d 759, 764 (1998). Based on the record, the findings of the trial court are supported by clear and convincing evidence and the decision of the trial court was not manifestly erroneous. The defendant failed to satisfy his burden of proof. In reviewing decisions concerning the freedoms allowed to a person committed after an NGRI finding, reviewing courts have long "recognized that predicting the future dangerousness of an individual is an inexact medical science, and therefore, [they] have held that orders of commitment will not be overturned when there is 'a reasonable expectation that the respondent would engage in dangerous conduct.' " *In re Knapp*, 231 Ill. App. 3d 917, 920 (1992), quoting *In re Powell*, 85 Ill. App. 3d 877, 880 (1980). In the instant case, the evidence demonstrates that defendant, if released, would reasonably be expected to inflict serious physical harm upon himself or another.

## I. RULING IS NOT MANIFESTLY ERRONEOUS

■ Drs. Mahmood, Kim-Ansbro and Flippen each testified that if the defendant was released and his future goals started falling apart, the stress factors could contribute to a mental deterioration causing defendant to act violently. The doctors stated concerns about defendant's lack of coping skills. While acknowledging that defendant had not become violent when faced with stress in the hospital setting, the doctors were concerned that defendant would not be able to cope with stress outside the hospital. The doctors explained the defendant did not have to deal with failure or rejection in the hospital setting because merely telling defendant that his goals were unrealistic did not force him to face the reality of failure. Dr. Flippen and Dr. Kim-Ansbro believed that if defendant was released he would be a potential danger. All three doctors stated their concerns that because of defendant's narcissistic traits, defendant could become violent when he experienced failure or rejection. For example, Dr. Mahmood opined that if defendant's goals of becoming rich and winning a Nobel prize fell through, defendant could act out violently. In addition, all three doctors testified that defendant's future plans to obtain his Ph.D. were completely unrealistic and that when defendant failed at achieving those goals, he would not be able to cope with the stress, which would lead to violence.

Further, the three doctors testified they were concerned that defendant could become violent if he was rejected romantically as well. The evidence demonstrated that defendant planned on having a relationship with J.B., the female therapist from Elgin, after he was released. J.B. had received inappropriate letters from defendant. The doctors believed that even though defendant had stopped sending letters to J.B., he did not really acknowledge or accept that she did not want to communicate with him. The doctors believed that if defendant actually faced romantic rejection by J.B. or anyone else, it could be a severe blow to his ego and he could respond violently.

Significant for each of the doctors was the fact that defendant never accepted that he suffered from a mental illness and he never accepted therapy to help him develop coping skills. Dr. Mahmood testified that she believed when things in defendant's life started to deteriorate, the defendant would not recognize if he were developing a psychosis and would not seek mental health treatment to help himself. Dr. Kim-Ansbro and Dr. Flippen also testified they did not believe defendant possessed the necessary coping skills because of his lack of insight into his mental illness. The doctors explained defendant's refusal to accept and acknowledge his mental illness increased his potential for dangerousness.

Defendant argues the evidence does not support the finding that defendant is reasonably expected to harm himself or others. Defendant relies on the testimony of Dr. Dinwiddie, who stated that defendant was not in need of inpatient mental health treatment and not a danger to himself or others. However, Dr. Dinwiddie acknowledged that his opinion was based on the absence of risk factors for violence, and those same factors were absent in 1985 when defendant violently attacked his father. The dissent fails to recognize that this fact significantly undermined the strength of Dr. Dinwiddie's opinion. Moreover, Dr. Dinwiddie recommended outpatient therapy for defendant; however, Dr. Dinwiddie admitted that defendant had no intention of participating in therapy.

Although each of the witnesses testified the defendant suffered from a mental illness at the time of the hearing, defendant maintains the various diagnoses given by each doctor are vague. Defendant argues the State failed to demonstrate defendant suffered from a specific mental illness and was dangerous. That conclusion is not supported by the record.

The experienced trial judge acknowledged that each of the witnesses stated a different diagnosis, but concluded the characteristics of each diagnosis were similar. The trial judge stated:

"What the doctors call it might change from time to time, but it is

> clear to me the underlying problem that [defendant] has has not changed since he was a very young man, and may indeed have been with him from birth. The way he responds to his disorder has changed *** but the underlying mental illness to me hasn't changed, no matter what tag you hang on it."

The trial judge made a finding supported by the record that defendant suffers from a mental illness. The court concluded that defendant's mental illness was a developmental disorder which has caused him problems throughout his life. Contrary to the dissent, the trial court's findings did not lack specificity. Moreover, the record reflects that not one, but three different doctors believed that, if released, defendant due to mental illness was reasonably expected to inflict serious physical harm upon himself or another. All three doctors were concerned that defendant could become violent if he experienced stress, failure or rejection. During the hearing, each of these doctors testified the defendant suffered from a mental illness and was reasonably expected to harm himself or another. There was nothing vague about that testimony or those opinions.

The witness testimony during the rehearing provided clear and convincing evidence to support the circuit court's finding that defendant is mentally ill and in need of inpatient care and that, if released, defendant is reasonably expected to harm himself or another. Our review of the evidence shows the circuit court's finding was not manifestly erroneous and defendant failed to satisfy his burden of proof. Each of the witnesses testified that defendant suffered from a mental illness at the time of the hearing. These diagnoses were different from defendant's diagnosis in 1989; however, each doctor testified that defendant was mentally ill. Moreover, three of the four doctors believed defendant needed inpatient care and that defendant was reasonably expected to harm himself or another if released.

As previously noted, the trial judge's decision is given great deference and, providing it is not against the manifest weight of the evidence, will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently. *In re Moore*, 301 Ill. App. 3d at 764. For the reasons previously discussed, the trial judge's conclusion that defendant, due to a mental illness, is reasonably expected to be a danger to himself or others was not manifestly erroneous.

## II. RULING DID NOT VIOLATE DUE PROCESS

■ Defendant argues that due process requires that his commitment may only be continued if he suffers from the same mental disorder which led to his acquittal. Defendant relies on *People v. Sanchez*, 126 Ill. App. 3d 746 (1984), in support of his argument that

the mental disorder which secures his commitment must be the same mental disorder which led to his acquittal.

*Sanchez* is not persuasive. First, the portion of the *Sanchez* opinion upon which the defendant relies is *dicta* and is not controlling here. Second, the *Sanchez* court was dealing with a diagnosis of a defendant's mental disorder for the initial hearing following an NGRI verdict. *Sanchez*, 126 Ill. App. 3d at 747. In the instant case, at issue is a diagnosis of the defendant's mental disorder for a hearing on defendant's petition for discharge or conditional release. This distinction is important for several reasons. The court in *Sanchez* stated that the statute "implicitly requires that a respondent's potential dangerousness directly relate to the mental illness which led to respondent's acquittal." *Sanchez*, 126 Ill. App. 3d at 749. Here, the State met this requirement in 1989 when the defendant was initially committed following his NGRI acquittal. The defendant now takes the language in *Sanchez* and argues that it requires the same diagnosis be made in order to continue his commitment. However, there is nothing in the statute or in the *Sanchez* case that supports this position. There is nothing in the language of the statute which indicates that the legislature intended to require the court, in denying a petition for discharge or conditional release, to make a finding that a defendant's diagnosis is the same as when the defendant was adjudicated NGRI. Further, the *Sanchez* case is not instructive regarding the issue in the instant case as to whether defendant's petition for discharge or conditional release should be granted.

Defendant's due process rights were not violated. The statute requires that the court find, upon clear and convincing evidence, that the defendant, due to mental illness, is reasonably expected to inflict serious physical harm upon himself or another and is in need of inpatient care. 730 ILCS 5/5—2—4(a)(1)(B) (West 2002). The statute further allows the defendant to file a petition for discharge or conditional release "under the standards of this Section." 730 ILCS 5/5—2—4(e) (West 2002). Here, the court made findings that, due to defendant's mental illness, he is reasonably expected to inflict serious harm upon himself or another. Based on the record, these findings are supported by clear and convincing evidence. Nothing in the statute requires the court to make a finding that the diagnosis of defendant's mental illness at the time of his hearing on a petition for discharge or conditional release is the same diagnosis made at the time of his NGRI adjudication.

## CONCLUSION

The ruling by the circuit court denying defendant's petition for

discharge or conditional release was supported by clear and convincing evidence. For the reasons previously discussed, we reject defendant's argument that the denial of discharge or conditional release was manifestly erroneous or in violation of defendant's due process rights.

Affirmed.

McNULTY, P.J., concurs.

JUSTICE TULLY, dissenting:

The witness testimony during the rehearing failed to provide clear and convincing evidence to support the circuit court's finding that the defendant is in need of inpatient care and that, if released, the defendant was reasonably expected to engage in dangerous conduct. My review of the evidence shows that the circuit court's finding was manifestly erroneous and the defendant is entitled to discharge. Each of the expert witnesses testified that the defendant suffered from a mental illness at the time of the hearing. The diagnoses, however, were diverse and vague. The law requires that the defendant be diagnosed with a specific mental illness and that he be found to be dangerous. Here, these criteria were not met.

As the majority states, Dr. Mahmood, Dr. Flippen and Dr. Kim-Ansbro each testified that, if the defendant was released and his future goals started falling apart, the stress factors *could* contribute to a psychosis and defendant *could* act violently. The doctors stated concerns about defendant's lack of coping skills. The doctors were concerned that the defendant would not be able to cope with stress outside the hospital, yet they acknowledged that defendant had not become violent when faced with stress in the hospital setting. Dr. Flippen and Dr. Kim-Ansbro believed that if defendant was released he would be a potential danger over time. All three doctors stated their concerns that because of defendant's narcissistic traits, defendant *could* become violent when he suffered failure or rejection.

The evidence and the testimony of the doctors, however, belie their opinion that he could be dangerous. The doctors acknowledged that in the 12 years that defendant has been in mental health facilities, he has never acted violently, never made any threats, never been restrained and never been medicated. Moreover, during the four-year period the defendant eloped from the Elgin facility, he lived on his own, was employed, and did not act violently against anyone. The defendant has no symptoms of psychosis or delusions.

Significant for each of the doctors was that the defendant never accepted that he suffered from a mental illness and he never accepted

therapy to help him develop coping skills. Dr. Mahmood testified that she believed when things in defendant's life started to deteriorate, the defendant would not recognize if he were developing a psychosis and would not seek out mental health treatment to help himself. Dr. Kim-Ansbro and Dr. Flippen also testified that they did not believe the defendant possessed the necessary coping skills because of his lack of insight into his mental illness. The doctors explained that defendant's refusal to accept and acknowledge his mental illness increased his potential for dangerousness.

This, however, does not support the finding that defendant is reasonably expected to harm himself or others. The defendant has not demonstrated any aggressive or threatening behavior. In fact, the defendant has demonstrated that he is not dangerous both in the hospital setting and in the community.

The fourth doctor to testify, Dr. Dinwiddie, disagreed with the other three and stated that in his opinion the defendant was not in need of inpatient mental health treatment and that defendant was not reasonably expected to inflict harm on himself or anyone else. In my humble opinion, Dr. Dinwiddie came closest to the proper diagnosis of the defendant. Dr. Dinwiddie testified that his opinion was based in part on the absence of risk factors for violence. Dr. Dinwiddie acknowledged that those same risk factors were absent in 1985 when the defendant violently attacked his father; however, the doctor pointed to the defendant's nonviolent history for the past 19 years. Dr. Dinwiddie explained that the defendant has lived in a variety of settings, both in and out of mental health facilities, where he experienced many stressors that might provoke violent behavior. Yet even in situations that tested the defendant's ability to cope with frustration and failure, the defendant apparently has not acted violently in any of those settings.

I believe that the findings of the circuit court are not supported by clear and convincing evidence and the decision of the circuit court was manifestly erroneous. The trial court failed to make a finding giving defendant a specific diagnosis. Further, the evidence simply does not support the court's finding that the defendant is reasonably expected to inflict serious physical harm upon himself or another in the near future. This defendant should be released today.

For these reasons, I respectfully dissent.