2025 IL App (3d) 240450

Opinion filed July 24, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-24-0450 Circuit No. 19-CF-1043 |
| IRENE S. LAWSON, | ) ) | The Honorable Daniel Rippy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court, with opinion.
Justices Davenport and Anderson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1      The defendant, Irene S. Lawson, was committed to Elgin Mental Health Center after being found not guilty by reason of insanity on a charge of aggravated battery. Several years later, she filed a petition for discharge. At the hearing on the petition, the circuit court granted the State's motion for a directed verdict. On appeal, Lawson argues that the circuit court's ruling was erroneous. We reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3          In June 2019, Lawson was charged by indictment with aggravated battery (720 ILCS 5/12-3.05(d)(4)(i), (h) (West 2018)). The indictment alleged that Lawson struck a corrections officer in the head.

¶ 4          During a 2020 evaluation of Lawson's fitness to stand trial, the Department of Human Services (DHS) diagnosed her as having schizoaffective disorder, bipolar type, and recommended inpatient treatment. In November 2021, the circuit court found Lawson not guilty by reason of insanity. Subsequently, she was committed.

¶ 5          In March 2024, Lawson filed a petition for discharge. Attached to the petition was a February 2024 evaluation by her treating psychiatrist, Dr. Christopher Sullivan, who concluded that Lawson

> "ha[d] been malingering psychotic symptoms for years. It is believed that her motivations for doing so are escaping responsibility for her violent behavior, receiving satisfaction and a feeling of power from deceiving clinicians and the system, and receiving immediate, reinforcing attention when she behaves like she has a mental illness."

Accordingly, Dr. Sullivan opined that Lawson did not suffer from a psychotic illness; rather, she suffered from antisocial personality disorder. Dr. Sullivan concluded:

> "If Ms. Lawson was released from custody, it is a virtual certainty that she would continue to assault others in the community, given her extraordinarily extensive history of doing exactly that at Elgin MHC. It is understandable to think that continuing to keep her hospitalized makes sense so as to protect the general public from her assaults. However, because her diagnosis is one of malingering and not a true (and treatable) psychotic illness, Elgin MHC is not a useful or appropriate place for her to stay. Our treatment strategies

have not been effective and would not be expected to be effective for someone whose only diagnoses are malingering and antisocial personality disorder. The prognosis of these conditions is poor, particularly in her case because of the severity of those conditions, and the likelihood of changing her behavior with further treatment here is miniscule. Continuing Ms. Lawson's hospitalization at Elgin MHC reinforces to her that if she acts mentally ill she can successfully deceive the system to her advantage and avoid more severe legal consequences for her violence. The standard of care of inpatient psychiatry is that chronic, heightened risk of aggression and criminal behavior due to antisocial personality disorder and / or malingering alone is not a valid reason for continued hospitalization. In other words, if Ms. Lawson no longer had a court order committing her to Elgin MHC, the plan would be to discharge her to the community. Given that she does not have a psychotic mental illness, it is not essential that she continue on psychiatric medication or otherwise continue outpatient treatment if she were released, hence our opinion is that she is not in need of outpatient level treatment either."

¶ 6    The circuit court held a hearing on Lawson's petition, beginning in May 2024. Dr. Sullivan testified that he had been Lawson's treating psychiatrist at Elgin Mental Health Center since the summer of 2023. He stated that Lawson's behavior varied at the facility. Most of the time, she was "fairly pleasant and calm, but she has had a fairly extraordinary number of aggressive outbursts, including things like punching our staff or other patients, oftentimes without a clear stimulus to it, some property damage." However, he opined that she did not suffer from psychosis. He came to his conclusion that she was malingering after a careful observation of her behavior over several months. Dr. Sullivan stated that while Lawson would sometimes say things that would make her

3

seem delusional, she was not consistent with her purported delusions, as is typical of someone suffering from delusions. He also stated,

> "[s]he has also made statements to me—like when asked by me or another psychiatrist why do you fight so much and she will say my delusions or my hallucinations, and, in my experience, people who have schizophrenia or other like primary psychotic illnesses, they really don't use language like that. Like, they are not aware what they think or are hearing is actually psychotic."

¶ 7 Dr. Sullivan also testified that he had prescribed Lawson two antipsychotic medications, Risperidone and Clozapine. A prior psychiatrist had prescribed her Olanzapine. Lawson did not show any reduction in her aggressive behavior with those medications, indicating that she was not psychotic.

¶ 8 Despite his skepticism that Lawson was psychotic, Dr. Sullivan continued Lawson on medication in part because people with antisocial personality disorder have a need to exert control, which can sometimes be met by the intricacies associated with medication.

> "They are in custody, they are not free, they have to follow a lot of rules, but one thing they could have control over is *** whether they take medication, *** what medication, will the dose change today, will it go up, will it go down, do I change to something else."

Dr. Sullivan thought that Lawson's need to exert control through violence could possibly be satisfied by taking antipsychotic medications. He added that those medications can also help people without psychotic illnesses feel calmer.

¶ 9 Dr. Sullivan reviewed Lawson's treatment records. He questioned the reliability of the 2020 evaluation, in which Lawson was diagnosed with schizoaffective disorder, bipolar type, as it did not result from observing her over a period of months. He admitted that he opined in the past

4

that Lawson was in need of inpatient services, but he explained that was done because there was "such great momentum about her having mental illness from *** a wealth of records" that he needed time to observe her and because her case was unique. "[I]t's unusual at Elgin Mental Health Center that we have patients who do not have psychotic illnesses and it has taken a while to kind of sort out actually the best way to address this."

¶ 10    Dr. Sullivan explained that, in general, people with antisocial personality disorder are not treated in an inpatient setting. Further, antisocial personality disorder did not have an established medication for treatment. Medication was generally used to try to find "any sort of change or relief in the patient's antisocial behavior." He stated that there could be a small risk to the community if Lawson stopped taking her medication. He confirmed that his May 2024 evaluation reported that he had recently switched Lawson's medication in light of the possibility of her release. She was taking Clozapine and another antipsychotic medication, Aripiprazole, which was marketed under the commercial name Abilify. He believed Abilify would help because Clozapine required weekly blood draws, which sometimes made it difficult for patients to follow up with once released into the community, whereas Abilify merely required a monthly shot.

¶ 11    Dr. Sullivan opined that if Lawson were released, even though she had no specific intentions of harming others, "it's almost certain that at some point in the future she would assault somebody in the community again." However, the restrictions that came with commitment at Elgin Mental Health Center and the quick attention staff must give to aggressive outbursts likely exacerbated her behavior. Thus, "[t]he violence [was] more likely common within custody than out of custody." He stated that there was nothing more he or the facility could do to mitigate her risk to staff or the general public. Continued treatment at the facility would be of no benefit to her.

5

¶ 12 On cross-examination, Dr. Sullivan stated that Lawson had not been on Abilify long enough to determine whether it was effective for her. The prosecution also questioned Dr. Sullivan on whether the timing of Lawson's episodes of aggressive incidents and her episodes of appropriate behavior could be symptomatic of bipolar disorder. Dr. Sullivan answered that they could be, but only if Lawson's additional specific circumstances were ignored. Following Dr. Sullivan's testimony, the case was continued for several weeks to give Lawson more time on Abilify.

¶ 13 When the hearing resumed in June 2024, Dr. Sullivan was recalled to the stand. He stated that since the prior hearing, Lawson had several aggressive incidents, which he attributed to her observing him testify at the May hearing. He testified that Lawson told him a week after the hearing that she did not want to be seen as a liar or evil by her family. He stated:

"I think she feels *** a need to kind of double down on trying to prove that she is psychotic, and I think that she does—she believes that *** speaking in a disorganized, bizarre manner to me, when she meets with me, or attacking the staff or other patients randomly, I believe she believes that would be evidence that she is psychotic, like she is trying to prove it to me, is my opinion about it."

Additionally, he noted that she had been diagnosed with malingering when she was 12 years old. Dr. Sullivan opined that Lawson had become very skilled at malingering over the years.[1] He even believed that the not-guilty-by-reason-of-insanity finding was unfounded.

¶ 14 The defense also called the medical director of Elgin Mental Health Center, Dr. John Cummins, to the stand. Dr. Cummins testified that he was a board-certified psychiatrist who had treated Lawson during a period in 2021 and for two months in 2024, when Dr. Sullivan was away

---

[1]Lawson was 28 years old at the time of the June 2024 hearing.

from work. He was the psychiatrist who found Lawson fit to stand trial; he diagnosed her with antisocial personality disorder and did not find any evidence of psychoses. He observed incidents of her potentially malingering, including an incident in which she displayed insight into her alleged delusions. She exhibited control over her symptoms, which is generally not seen in someone with an organic psychotic illness. He described her aggressive incidents as "stimulus-seeking behavior" consistent with severe antisocial personality disorder. He opined:

"So another portion of antisocial personality disorder and what we call the Cluster B personality disorder is an inability to tolerate distress and not having the strategies that the *** average population has to cope with distress, whereas some folks will use self-soothing techniques, some folks will remove themselves from situations, some folks will sublimate it into art or music or running or punching a bag. Irene has not developed those coping strategies over the course of her life. Her coping strategies instead has [*sic*] been to assert dominance and seek stimulation to help reduce that distress and distract her from it. This is very common among folks with [antisocial personality disorder]."

¶ 15 Dr. Cummins testified that he would not be surprised if Lawson reoffended, but that "there is less potential for her to do harm if she is in society than when she is in a unit with vulnerable people." He also explained that inpatient hospitals were not appropriate places for treatment of personality disorders.

¶ 16 After the defense completed its case-in-chief, the State moved for a directed verdict. The court took the matter under advisement. When the court announced its ruling, it stated:

"The Court having reviewed the testimony of the parties, the relevant statutes and the relevant case law find [*sic*] that the defendant has not met her burden to show that she is not a danger to the community or herself.

7

And I will note for the record that both doctors were called, indicating that while they believed she was malingering, they did believe that she was still a danger to herself and the community.

And based on that, the fact that this Court does find that while she suffers from a personality disorder and such, that she poses a significant risk to herself and to the community.

And, therefore, I'm granting the State's motion for directed finding.

Defendant will be remanded to the Department of Human Services for further treatment."

¶ 17    Lawson appealed.

¶ 18                                    II. ANALYSIS

¶ 19    On appeal, Lawson argues that the circuit court erred when it granted the State's motion for directed verdict.

¶ 20    "A motion for directed verdict will not be granted unless all of the evidence so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010). If a plaintiff has established a *prima facie* case—*i.e.*, has presented "at least some evidence on every essential element of the cause of action"—a directed verdict in favor of the defendant is inappropriate. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). We construe the evidence in the light most favorable to the nonmoving party and review *de novo* a circuit court's order granting a motion for directed verdict. *Krywin*, 238 Ill. 2d at 225.

¶ 21    Section 5-2-4 of the Unified Code of Corrections controls proceedings that take place after an individual has been found not guilty by reason of insanity. 730 ILCS 5/5-2-4 (West 2022). "If

8

the defendant is found to be in need of mental health services on an inpatient care basis, the Court shall order the defendant to the Department of Human Services" for placement in a secure setting. *Id.* § 5-2-4(a).

¶ 22　　Pursuant to section 5-2-4(e), a defendant may file a petition for discharge from commitment "under the standards of this Section." *Id.* § 5-2-4(e). A hearing on the petition must be held within 120 days of the circuit court's receipt of the petition. *Id.* It is the defendant's burden to prove at the hearing, by clear and convincing evidence, that he or she is eligible for discharge. *Id.* § 5-2-4(g). The standard applicable to discharge hearings is whether the defendant is no longer "in need of mental health services on an inpatient care basis" (*id.* § 5-2-4(a)), which is defined as "a defendant who has been found not guilty by reason of insanity but who, due to mental illness, is reasonably expected to inflict serious physical harm upon himself or another *and* who would benefit from inpatient care or is in need of inpatient care" (emphasis added) (*id.* § 5-2-4(a-1)(B)).

¶ 23　　The significance of the legislature's use of the conjunction "and" in section 5-2-4(a-1)(B) cannot be understated. *Both* elements must be present for an individual to be admitted to, or remain in, secure placement with the Department of Human Services. Thus, it is axiomatic that when a defendant seeks discharge under section 5-2-4, he or she needs to *disprove* only one element to satisfy his or her burden. *Cf. People v. Bryson*, 2018 IL App (4th) 170771, ¶ 41 (discussing section 5-2-4's standard in the context of a petition for conditional release). In other words, if a defendant proves that he or she either (1) is not reasonably expected to inflict serious physical harm upon himself or herself or another *or* (2) would not benefit from inpatient care or is not in need of inpatient care, then the circuit court must grant the petition for discharge. *Id.*

¶ 24　　We clarify this standard because it is evident that the State has misconstrued section 5-2-4 in its brief. The State contends that "[t]he defendant's burden is to show, by clear and convincing

9

evidence, that, due to their mental illness, the defendant is not reasonably expected to inflict serious harm upon themselves or another, *and* would not benefit from further inpatient care or be in need of such inpatient care." (Emphasis added.) We emphasize that it is not the defendant's burden to disprove both elements; disproving one means that the petition for discharge must be granted.

¶ 25  Moreover, the State's reliance on *People v. Youngerman*, 361 Ill. App. 3d 888 (2005), is misplaced. In its response brief on appeal, the State relies heavily on *Youngerman*, arguing that "the key issue is whether the defendant has a mental illness and poses a risk to public safety." The State fails to acknowledge, however, that *Youngerman* involved an older and markedly different version of section 5-2-4. See 730 ILCS 5/5-2-4 (West 2002) (effective January 1, 2000, to December 31, 2000). At the time *Youngerman* was decided, an individual who was acquitted by reason of insanity could be held in a secure setting if he or she was "subject to involuntary admission *or* in need of mental health services on an inpatient care basis." (Emphasis added.) *Id.* § 5-2-4(a). As *Youngerman* noted, the " '[s]ubject to involuntary admission' " standard could be met by showing merely that the individual was "reasonably expected to inflict serious physical harm upon himself or another in the near future" (*id.* § 5-2-4(a)(1)(A)(i)). *Youngerman*, 361 Ill. App. 3d at 894. That standard no longer exists in section 5-2-4. *Youngerman* is no longer good law, and we reject the State's attempt to apply it to the instant case.

¶ 26  The circuit court also misconstrued section 5-2-4 in this case, as it premised its ruling solely on Lawson posing "a danger" or a "significant risk" to herself and the community. Initially, we note that the statute requires more than just "a danger" or a "significant risk." It requires that a defendant "is reasonably expected to inflict *serious physical* harm upon himself or another." (Emphasis added.) 730 ILCS 5/5-2-4(a-1)(B) (West 2022). Regardless, even if Lawson failed to establish a *prima facie* case on the "serious physical harm" element, that failure would not have

been dispositive of the directed verdict question due to the legislature's use of "and" in section 5-2-4(a-1)(B).

¶ 27     Here, the circuit court ignored the second element in section 5-2-4(a-1)(B), *i.e.*, whether Lawson would benefit from inpatient care or was not in need of inpatient care. In that regard, two expert witnesses, both of whom had treated Lawson for periods of time, opined that Lawson would not benefit from inpatient care. She was diagnosed with malingering and antisocial personality disorder, neither of which were psychotic illnesses. The expert witnesses unequivocally testified that inpatient hospitals like Elgin Mental Health Center were not appropriate facilities for the treatment of malingering or antisocial personality disorder. Dr. Sullivan and Dr. Cummins both testified in detail about these matters, including why Lawson specifically would not benefit from further inpatient treatment. Accordingly, Lawson clearly established a *prima facie* case that she would not benefit from inpatient care. Thus, under the circumstances of this case, we hold the circuit court erred when it granted the State's motion for directed verdict.

¶ 28     We acknowledge that Lawson had rested her case at the hearing the circuit court held on her motion for discharge. However, due to the passage of time and the temporal nature of the evidence in a case such as this, on remand, the circuit court is instructed to provide Lawson with the opportunity to reopen her case-in-chief, followed by the court conducting the remainder of the hearing on Lawson's motion for discharge in conformity with the law as clarified by this court.

¶ 29                                III. CONCLUSION

¶ 30     The judgment of the circuit court of Will County is reversed and the cause is remanded for further proceedings.

¶ 31     Reversed and remanded.

*People v. Lawson*, 2025 IL App (3d) 240450

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 19-CF-1043; the Hon. Daniel Rippy, Judge, presiding. |
| **Attorneys for Appellant:** | Michael J. Renzi, Public Defender, of Joliet (Eric Berg, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |