2018 IL App (4th) 170771

NO. 4-17-0771

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 11, 2018
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Douglas County |
| TISHA BRYSON, | ) | No. 15CF115 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Richard L. Broch Jr., |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Knecht and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        In November 2015, defendant, Tisha Bryson, was arrested and charged with attempted aggravated kidnapping. In January 2016, in a stipulated bench trial, defendant was found not guilty by reason of insanity (NGRI) and remanded to the custody of the Department of Human Services (DHS). In May 2017, defendant petitioned the trial court for a conditional release, and the court denied the petition.

¶ 2        On appeal, defendant argues (1) the trial court's denial of her petition for conditional release was against the manifest weight of the evidence and (2) the court erred in applying a different and stricter standard in its review of her petition for conditional release. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                        A. Defendant's Hospitalization

¶ 5         In November 2015, defendant confronted a woman with a small child, informed the woman "witches" had taken her baby, and inquired whether the woman was a witch. Later that day, defendant entered, uninvited, the residence of people she did not know, picked up their two-year-old child, and attempted to leave, claiming the child was hers. When later arrested by the police, she contended the police car was hers and believed she possessed "angel wings." As a result of the incident, she was charged with attempted aggravated kidnapping (720 ILCS 5/8-4(a), 10-2(a)(2) (West 2014)).

¶ 6         By the time she was charged in this case, defendant had been psychiatrically hospitalized approximately 30 times in an 11-year period, and she was released from the hospital only three days before this incident. Upon her release, she met up with a friend and consumed both "ecstasy" and alcohol, choosing not to take the medications, which had only recently stabilized her behavior. During a previous hospitalization, defendant set bed sheets on fire in an attempt to be removed from the hospital and taken to jail because she believed the hospital employees were going to harm her. This resulted in a charge of arson, which was reduced to a charge of criminal damage to property, for which she was on probation at the time of this offense. Defendant had a history of being noncompliant with medication and admitted regular street drug and alcohol abuse when not in a controlled environment. Although she currently acknowledges awareness that her usage of both substances exacerbated her psychiatric symptoms, it is unclear from the record how long she has possessed such awareness. Defendant was diagnosed with bipolar I disorder, current or most recent episode manic with psychotic features, the most serious form of bipolar disorder according to the doctors. She also has a criminal history, as well as a history of engaging in behavior, which threatened harm to herself and others when not stabilized with prescribed medication.

¶ 7            In January 2016, pursuant to a stipulated bench trial, defendant was found NGRI of attempted aggravated kidnapping (720 ILCS 5/8-4(a), 10-2(a)(2) (West 2014)). As a result of the NGRI finding, in March 2016, the trial court held a hearing pursuant to section 5-2-4 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-2-4 (West 2016)) to address proceedings after acquittal by reason of insanity. At that time, it was determined defendant was "in need of mental health services on an inpatient basis," and she was ordered into the custody of the DHS, which placed her in McFarland Mental Health Center (McFarland).

¶ 8            In May 2017, defendant filed a petition for conditional release pursuant to section 5-2-4(e) of the Unified Code (730 ILCS 5/5-2-4(e) (West 2016)). She retained counsel, who filed an amended petition on her behalf in June 2017. In September 2017, at the hearing on defendant's petition for conditional release, defendant called three witnesses: Dr. Monica Eberhardt, defendant's treating psychiatrist at McFarland; Dr. Michelle Womontree, her clinical psychologist at McFarland; and Dr. Ryan Finkenbine, a forensic psychiatrist from the University of Illinois College of Medicine. The State called no witnesses, stipulating to the qualifications of each expert witness called by defendant.

¶ 9                                      B. Dr. Eberhardt's Testimony

¶ 10          Dr. Eberhardt, as defendant's treating psychiatrist since May 18, 2017, saw her at McFarland five times, twice individually and three times during treatment team meetings. These meetings normally lasted between 15 to 30 minutes. She testified defendant was not compliant with her psychiatric medication and was actively involved in street drug use during the time leading up to the kidnapping incident. Her drugs of choice included alcohol, cocaine, methamphetamine, and marijuana. Defendant acknowledged having previously used lysergic

acid diethylamide and on one occasion found herself wandering around Chicago with no idea how she got there or where she was.

¶ 11 Dr. Eberhardt described defendant's symptoms at the time of the offense as "manic symptoms consisting of elated affect, the irritability, paranoid delusions where she believed witches stole her baby, who at the time was two months old. She presented with grandiose delusions where she believed she owned the town. That later on when police arrived, she stated the police car was hers." She characterized defendant's symptoms as "very severe."

¶ 12 According to Dr. Eberhardt, defendant's manic symptoms had "resolved" since an incident in October 2016, when a medication change resulted in a temporary increase in manic and psychotic symptoms. Dr. Eberhardt also noted defendant was no longer using street drugs because she was in a controlled environment where she had no access. However, she also admitted, in the past, when not in a controlled environment, defendant would stop taking her psychotropic medications for a number of reasons. Defendant said they "stunted [her] creativity" and made her feel "weird" or "depressed." Dr. Eberhardt also acknowledged, prior to her commitment, defendant engaged in almost daily use of alcohol and marijuana.

¶ 13 It was Dr. Eberhardt's opinion the reason for defendant's lack of current bipolar disorder symptoms was the result of daily therapy, which included the controlled and monitored administration of psychotropic medication, as well as individual and group therapy.

¶ 14 It was the doctor's opinion defendant had insight into her psychiatric illness and understood her symptoms would recur if she discontinued prescribed medication. Dr. Eberhardt also believed it would take 7 to 10 days for bipolar disorder symptoms to recur if defendant stopped taking her medication and within days if she returned to using alcohol or illegal drugs. The doctor said she had no reason to believe defendant would stop taking her medication. The

doctor also believed defendant had gained insight into her substance use and "she does not plan to go back to using alcohol and illicit substances." Dr. Eberhardt explained how medications are administered at McFarland and the how the controlled nature of administration and monitoring would not be present if defendant were not in a controlled environment like McFarland.

¶ 15　　　　Dr. Eberhardt was also of the opinion defendant understood how her mental illness related to her crime, appreciated the seriousness of the offense, and was remorseful. At the time of the hearing, defendant was in a minimum security unit where she had been since June 2016. She also had "grounds" privileges since June 2017, which allowed her to leave her unit for up to an hour after signing out and permitted her to walk the grounds without staff supervision. She had access to unfenced areas and had never sought to escape. During her time at McFarland, defendant followed most of the rules and had not disobeyed staff or attempted to harm herself or anyone else, except for an incident in October 2016, when she required forced, emergency medication after threatening to kill someone. It was Dr. Eberhardt's professional opinion this incident occurred because of a manic episode brought on by a medication change due to the addition of an antidepressant. After the removal of the antidepressant from defendant's medication regimen, her condition resolved. Dr. Eberhardt acknowledged there had been several instances where defendant's attendance at therapy sessions was sporadic, she had engaged in inappropriate behavior with a male patient, and she had to leave some group sessions due to her inappropriate comments.

¶ 16　　　　According to an HCR-20 violence risk assessment tool administered in August 2017, Dr. Eberhardt indicated defendant was assessed as a "low risk" for violence. It was her professional opinion defendant was not an imminent risk to hurt herself or others. "At this time, is [*sic*] [defendant's] symptoms are resolved and she's not using any alcohol or illicit substances.

She's compliant with treatment." It was also Dr. Eberhardt's opinion defendant did not meet the criteria for inpatient hospitalization; however, Dr. Eberhardt was not recommending defendant's conditional release. She also indicated there were not opportunities for defendant to exhibit behavior outside a controlled environment since McFarland did not have an "off grounds without staff" privilege.

¶ 17 When asked why she had not sought defendant's release at this point, Dr. Eberhardt said she and the rest of the treatment team wanted to see how defendant did with the recently awarded grounds privileges first. They wanted to evaluate her performance with the increased privileges for "at least six months before [they] considered conditional release." They were also interested in evaluating her behavior for at least six months from the last incident with a peer, which had occurred in July. Although she was of the opinion defendant was not at risk to inflict serious harm upon herself or others "at this time," Dr. Eberhardt acknowledged how her violation of what might appear to be "small rules" at McFarland could mean defendant would not follow "big rules" outside.

¶ 18 The extended length of defendant's hospitalization has, in the opinion of Dr. Eberhardt, contributed to her stability because it has given her the ability to gain insight into her mental illness and substance-abuse issues. She noted how, if conditionally released, any violation of any conditions attached to her release would result in her immediate return to McFarland.

¶ 19 When questioned further by the trial court, Dr. Eberhardt said neither she nor the treatment team were recommending defendant for conditional release because they were of the opinion defendant needed more time in treatment. The doctor acknowledged that some of defendant's behaviors were concerning and further acknowledged, upon questioning by the court, defendant may be motivated to seek release from McFarland, in part, due to the pending

juvenile case involving her child and the influence her continued hospitalization may have on the Department of Children and Family Services (DCFS).

¶ 20 C. Dr. Womontree's Testimony

¶ 21 Dr. Womontree served as defendant's treating clinical psychologist since September 2016. During that time, she saw defendant for approximately 1½ hours per week in a group session, as well as another hour per week individually. She described defendant's bipolar disorder symptoms at the time of the offense as "primarily manic at that time, and had delusions, hallucinations, poor judgment," and disturbed sleeping. Defendant was not compliant with her psychiatric medication and was using illegal drugs.

¶ 22 Dr. Womontree said defendant's clinical condition changed "remarkably" since her hospitalization. In her opinion, defendant was "really taking her treatment seriously for the first time." She believed defendant was committed to her treatment and was attempting to learn behaviors that would contribute to her continued stability. Dr. Womontree agreed defendant had been free of bipolar disorder symptoms since the brief psychotic episode in October 2016 caused by a temporary medication change.

¶ 23 At the time of the hearing, defendant was receiving individual and group therapy, psychotropic medication in the form of lithium and Depakote, psychoeducational group therapy, and participating in a variety of psychosocial activities. Dr. Womontree related an incident where defendant had been hit by another patient and did not retaliate as positive evidence of her advances in individual therapy. Instead of reacting to the unprovoked attack, defendant was able to discuss it in therapy. After initially participating in Alcoholics Anonymous (AA), defendant was leading a group as well as attending.

¶ 24    It was Dr. Womontree's opinion defendant "understands that she has a severe mental illness that requires daily attention in order to maintain recovery." She said defendant also knew she had to take her medication without fail, realizing she would rapidly begin manifesting symptoms if she did not. It was the doctor's opinion defendant's symptoms would reappear within days to a couple of weeks of stopping her medication.

¶ 25    Dr. Womontree said the primary reason why defendant had exhibited no symptoms of substance abuse was due to her presence in a controlled environment. She also believed defendant was "gradually" becoming more educated about the effects of substance abuse on her mental illness. The doctor was also of the opinion defendant understood the seriousness of her criminal offense and the harm it caused and she felt remorseful about it.

¶ 26    Dr. Womontree agreed defendant had been in the minimal security unit since June 2016 and had "grounds privileges," which allowed her free access to McFarland grounds, including unsecured areas from which she could walk away or escape from if she chose. Dr. Womontree also agreed with Dr. Eberhardt that defendant never attempted escape, attempted or caused physical harm to anyone, or required physical restraint while at McFarland. Dr. Womontree described defendant as being "exceptionally active" in her treatment, taking advantage of everything McFarland had to offer. She said defendant had been exposed to cognitive behavioral therapy as well as "rationally motivated therapy" designed to address real-life, problem-solving issues, and defendant has expressed her desire to continue individual therapy after leaving the hospital.

¶ 27    Dr. Womontree was also familiar with the HCR-20 violence risk assessment tool and defendant's assessment as a "very low risk" for future violence. Put in context, Dr. Womontree noted how normally, the nature of the historical factors alone is enough to place

someone in the "moderate risk" range, so the fact that defendant was considered a low risk was "unusual and outstanding."

¶ 28 As a result, it was Dr. Womontree's professional opinion defendant was "not reasonably expected to harm herself or another," and defendant could "benefit from continued treatment but as an [outpatient]." Dr. Womontree's opinion was based on defendant's active efforts toward treatment, "the actual stability" the doctors witnessed during her hospitalization, her "response to treatment, and her responsible approach to improving her life."

¶ 29 Dr. Womontree admitted on cross-examination, however, defendant's risk of dangerousness would increase if she was not compliant with her medication, which would not be administered and monitored for her outside of a controlled environment. She also agreed defendant had not been given the opportunity to test her learned skills off McFarland's grounds.

¶ 30                     D. Dr. Finkenbine's Testimony

¶ 31 Dr. Finkenbine, a professor and chair of the Department of Psychiatry at the University of Illinois College of Medicine, testified as a forensic psychiatry expert on behalf of defendant. His task was to perform a three-hour, conditional-release assessment of defendant, which he did in August 2017. Many of his findings were consistent with those expressed by the two previous witnesses and need not be repeated here.

¶ 32 When Dr. Finkenbine examined defendant in August, he found her "almost normal" and exhibiting none of the various symptoms of bipolar disorder seen previously. He was aware of her brief period of psychotic behavior in October 2016 due to the addition of an antidepressant known to cause manic symptoms in some patients, but otherwise, he did not find her to be exhibiting any of the other behaviors described by the other experts. He ascribed this change to proper medication, therapy, and counseling and believed, as did Dr. Womontree,

defendant had a greater appreciation for her mental illness and the need for continued medication.

¶ 33        Dr. Finkenbine noted defendant's long history of noncompliance with medication; however, he believed her extended hospitalization, along with the education provided by her psychiatrist and counselor, have allowed defendant to better understand the need to maintain her medication as prescribed. He described three reasons given by defendant for discontinuing her medication in the past: (1) her pregnancy; (2) when she would experience side effects necessitating a medication change; and (3) poor decision-making when she did not want to continue taking her medication, which he described in his report as, "[s]he did not think she needed medications and liked some of her symptoms of mania (*e.g.*, feeling 'up', more creative and energetic)." On cross-examination, he admitted mentioning in his report how, although defendant's insight had improved, it was still limited. He acknowledged the large number of hospitalizations for defendant was unusual. His report noted how her history of alcohol and drug use "increase[d] the risk for dangerous behavior with relapse." In addition, Dr. Finkenbine admitted despite being fully compliant with her medication, defendant remained unable to follow all of the internal rules at McFarland during her time there, including an incident fairly recently with a male patient. He also noted defendant has not had the opportunity to demonstrate her ability to remain compliant when not in a controlled environment and that her presence in such a controlled environment factors into her increased compliance.

¶ 34        He said defendant had been free from symptoms of substance abuse for two years by the time of his interview. Dr. Finkenbine was of the opinion this was due, in part, to forced abstinence, but also due to defendant's recognition of her substance-abuse issues, the various treatment programs, and counseling she had received at McFarland, including taking an active

role in leading some of the AA meetings. He found defendant to be intelligent and able to recognize the links between her use of illegal drugs and unfortunate events in her life, as well as understanding some of the things that triggered her substance abuse. Dr. Finkenbine testified defendant's attitude and understanding of the need to stay off illegal drugs was "high." He also found she had a "reasonable appreciation" of the harm her crime had caused and understood how both her mental illness and substance abuse contributed to her crime. At the time of his evaluation, defendant was on the lowest security level at McFarland, had made no attempt to escape, and had neither caused nor attempted any physical harm to herself or anyone else. Dr. Finkenbine reiterated defendant's low violence risk assessment scoring.

¶ 35        It was also Dr. Finkenbine's opinion defendant did not meet the criteria for involuntary admission. He found her risk to harm herself or others was "greater than that associated with persons in the general population but about the same as those associated with [NGRI] acquittees who are released with conditions." When asked whether she continued to need mental health treatment on an inpatient basis, Dr. Finkenbine was of the opinion defendant no longer needed to be hospitalized but that she would continue to benefit from treatment on an outpatient basis. His report, however, acknowledged the benefits of continued inpatient care in that she was "more likely to adhere to the treatment recommendations, take medications, attend group [therapy] and activities, and abstain from alcohol and intoxicating substances." He noted how an inpatient setting helped restrict her from experiencing active symptoms of mental illness and thereby reduced the risk of harm to herself and others. However, he believed there were certain conditions that could be placed on her release to assure satisfactory progress in treatment, as well as the safety of herself and others, and that her continued inpatient care was not the "least restrictive" setting to manage her clinical needs. He listed a series of suggestions relating to

medication monitoring, psychiatric treatment and counseling, and methods of therapy. He also suggested the records of the various providers be available to each other as well as to the court. Dr. Finkenbine emphasized the need for both abstinence from street drugs and random drug screens and suggested defendant be released to a group home (as opposed to living on her own when first released), avoid contacting certain people, and have no access to firearms. Lastly, he said defendant needed to pursue financial support and any assistance available to her through Social Security or employment.

¶ 36        Dr. Finkenbine acknowledged his awareness of the treatment team's current position of not recommending conditional release. In spite of the testimony of Dr. Eberhardt indicating both she and the team believed defendant needed more time, Dr. Finkenbine contended it was due to some unspecified policy of McFarland requiring an independent assessment before making a recommendation, not a matter of their therapeutic or psychiatric opinions. He did acknowledge, upon further questioning by the State, he was surprised to learn one of the team members had earlier testified defendant needed more time to practice her learned skills and develop further insight.

¶ 37        The trial court denied the petition for conditional release, stating it had not been shown by clear and convincing evidence defendant was not in danger of seriously injuring herself or others if conditionally released. The court based its decision on a number of factors: (1) defendant's substantial history of noncompliance with medication and substance abuse, (2) the seriousness of her behavior when not compliant with medication and abusing substances, (3) the fact that professional opinions regarding her behavior and performance were based upon her current condition while in a totally controlled environment, and (4) the presence of rule violations within McFarland even while working toward conditional release. The court also

considered the fact defendant's treatment team believed she would continue to benefit from further inpatient treatment and that she did not appear to have a feasible plan for community reintegration. The trial court concluded defendant failed to meet her burden. This appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39        Defendant contends the trial court's ruling was against the manifest weight of the evidence because all the experts agreed she was an appropriate candidate for conditional release. To answer this question, we must engage in an analysis of the conditional release standard and the weight of expert testimony.

¶ 40                          A. Conditional Release Standard

¶ 41        Prior to 2000, section 5-2-4(g) of the Unified Code placed the burden of proof on the State to prove the defendant should not be conditionally released if the facility director recommends conditional release. 730 ILCS 5/5-2-4(g) (West 1998). However, after 2000, the burden shifted to the defendant regardless of who petitioned the court for the defendant's conditional release. 730 ILCS 5/5-2-4(g) (West 2004). In *People v. Jurisec*, 199 Ill. 2d 108, 766 N.E.2d 648 (2002), our supreme court described the operation of section 5-2-4 before the amendment that shifted the burden. The court explained how an insanity acquittee may be committed to the custody of the DHS "only if it is shown, by clear and convincing evidence, that the acquittee is subject to involuntary admission or in need of mental health services on an inpatient basis." (Internal quotation marks omitted.) *Jurisec*, 199 Ill. 2d at 116. Once committed, however, the acquittee "may be detained only as long as he [or she] continues to be subject to involuntary admission or in need of [inpatient] mental health services." (Internal quotation marks omitted.) *Jurisec*, 199 Ill. 2d at 116. The defendant's burden is to show by clear and convincing

evidence that, due to his or her mental illness (regardless of whether it was enough to require involuntary admission), defendant is not reasonably expected to inflict serious harm upon defendant's self or another and would not benefit from further inpatient care or be in need of such inpatient care. Under a plain reading of the statute, if defendant proves either element, namely defendant is (1) not reasonably expected to inflict serious physical harm upon defendant's self or another or (2) defendant would not benefit from inpatient care or is not in need of inpatient care, by clear and convincing evidence, the judge must grant the petition for conditional release. See 730 ILCS 5/5-2-4(a-1)(B) (West 2016). This would only make sense because, under section 5-2-4 of the Unified Code, the fact that a mentally ill person has committed a serious criminal offense is, alone, considered a sufficient reason to conclude that person is a danger to oneself or others, thereby justifying involuntary admission. See *Jones v. United States*, 463 U.S. 354, 366 (1983) (a finding of NGRI is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society). The Supreme Court went on to find that, having been found NGRI, a criminal defendant may continue to be confined in a mental institution "until such time as he [or she] has regained his [or her] sanity or is no longer a danger to himself [or herself] or society." *Jones*, 463 U.S. at 370. As a matter of due process, "it was unconstitutional for a State to continue to confine a harmless, mentally ill person." *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992). "Once a defendant is involuntarily admitted, he [or she] may be held only as long as he [or she] is both mentally ill and dangerous." *People v. Hager*, 253 Ill. App. 3d 37, 41, 625 N.E.2d 232, 236 (1993). "Different considerations underlie commitment of an insanity acquittee. As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." *Jones*, 463 U.S. at 369. Our supreme court, in *Jurisec*, 199 Ill. 2d at 129, held

- 14 -

"[t]he primary objective of section 5-2-4 is to insure that insanity acquittees are not indeterminately institutionalized [citation], and that the intrusion on liberty interests is kept at a minimum." (Internal quotation marks omitted.) It is for this reason conditional discharge was provided as a means to allow for reintegration of NGRI defendants into society. Representative Katz noted in the legislative debates prior to 1980, section 5-2-4 allowed for NGRIs to be released without court supervision if they were not in need of mental health treatment currently. 81st Ill. Gen. Assem., House Proceedings, May 17, 1979, at 102 (statements of Representative Katz). However, after the legislation's change in 1980, conditional release was made available as an option to the courts. Representative Katz saw this as a way to monitor the person as the facility director (known as the superintendent at the time) of the mental health center follows the individual, and he or she is required to report under the conditions imposed by what was at the time the Illinois Department of Mental Health and Developmental Disabilities (Department of Mental Health), and now is the Department of Human Services. The legislature stated this as a favorable option because "[t]hey are able to determine that the same kind of symptoms are reoccurring [*sic*] that characterize the original time that the first [a]ct was committed and they then can reinstitutionalize the individual until the individual is able to work out the problem and is safe to be released." 81st Ill. Gen. Assem., House Proceedings, May 17, 1979, at 102 (statements of Representative Katz). In Representative Katz's discussion about conditional release, he added as follows:

> "I would point out to you that in the State of Illinois, in the cases
> involving people found not guilty by reason of insanity that in half
> of those cases murder has been what has been committed. For that
> reason everyone one [*sic*] of these case[s] in which we are able to

prevent such an individual from going out and committing another crime, will be indeed, a great contribution to the people of Illinois." 81st Ill. Gen. Assem., House Proceedings, May 17, 1979, at 102 (statements of Representative Katz).

Under section 5-2-4(g) when considering conditional discharge, regardless of who may be petitioning, the court is permitted to consider the following factors:

"(1) whether the defendant appreciates the harm caused by the defendant to others and the community by his or her prior conduct that resulted in the finding of not guilty by reason of insanity;

(2) Whether the person appreciates the criminality of conduct similar to the conduct for which he or she was originally charged in this matter;

(3) the current state of the defendant's illness;

(4) what, if any, medications the defendant is taking to control his or her mental illness;

(5) what, if any, adverse physical side effects the medication has on the defendant;

(6) the length of time it would take for the defendant's mental health to deteriorate if the defendant stopped taking prescribed medication;

(7) the defendant's history or potential for alcohol and drug abuse;

(8) the defendant's past criminal history;

(9) any specialized physical or medical needs of the defendant;

(10) any family participation or involvement expected upon release and what is the willingness and ability of the family to participate or be involved;

(11) the defendant's potential to be a danger to himself, herself, or others; and

(12) any other factor or factors the Court deems appropriate." 730 ILCS 5/5-2-4(g) (West 2016).

¶ 42   It is reasonable to conclude conditional release was understood to come with some level of risk but that the facility and the court were in the best position to tailor conditions sufficient to minimize the risk to a level considered manageable and cognizant of society's inherent concerns about the release of persons who have committed criminal acts, been found insane, and were now being considered for some form of release. The legislature realized there is a careful balance to be struck between the interests of safety to the public, treatment for the mentally ill individual, and the individual's liberty interest.

¶ 43   In reviewing a petition for conditional release subsequent to hospitalization under section 5-2-4 of the Unified Code (730 ILCS 5/5-2-4 (West 2016)), the findings of the court must be "established by clear and convincing evidence." 730 ILCS 5/5-2-4(g) (West 2016). Both the burdens of proof and proceeding remain with the defendant or anyone filing on his or her behalf. 730 ILCS 5/5-2-4(g) (West 2016). The court must determine whether defendant is " '[i]n need of mental health services on an inpatient basis.' " 730 ILCS 5/5-2-4(a-1)(B) (West 2016).

- 17 -

" 'In need of mental health services on an inpatient basis' means: a defendant who has been found not guilty by reason of insanity but who due to mental illness is reasonably expected to inflict serious physical harm upon himself [or herself] or another and who would benefit from inpatient care or is in need of inpatient care." 730 ILCS 5/5-2-4(a-1)(B) (West 2016).

¶ 44                              B. Weight of Expert Testimony

¶ 45            Defendant relies on three cases to support her argument: *People v. Robin*, 312 Ill. App. 3d 710, 728 N.E.2d 736 (2000), *People v. Blumenshine*, 72 Ill. App. 3d 949, 391 N.E.2d 232 (1979), and *People v. Smith*, 126 Ill. App. 3d 5, 466 N.E.2d 1226 (1984). Defendant's cited cases either predate the current iteration of the statute or involve substantially different facts and legal standards. One thing they share in common is reference to a statement regarding how "the finding [requiring an NGRI defendant to remain in involuntary inpatient treatment] must be based upon an explicit medical opinion regarding the [defendant's] future conduct and can not be based upon a mere finding of mental illness." (Internal quotation marks omitted.) *Smith*, 126 Ill. App. 3d at 9; see also *Robin*, 312 Ill. App. 3d at 716. This statement lies at the heart of defendant's contention that it is manifest error to decline conditional release if the "experts" all testify in favor of release and, even when they do not, so long as their reasons, individually, would not constitute the basis for denial. In *Robin*, the court cited *People v. Czyz*, 92 Ill. App. 3d 21, 26, 416 N.E.2d 1, 4 (1980), as support for defendant's position; however *Czyz* is inapposite. *Robin*, 312 Ill. App. 3d at 718. In *Czyz*, the appellate court reviewed a direct appeal from an NGRI finding the defendant was in need of mental treatment under the old statute and issued an order placing him in the custody of the Department of Mental Health for outpatient treatment. *Czyz*, 92 Ill. App. 3d at 22. The issue on appeal was whether the State had established by clear and convincing evidence the defendant was in need of mental treatment. *Czyz*, 92 Ill. App. 3d at

22. In that case, one doctor said the defendant was not in need of mental treatment in a hospital setting, one said he was not in need of mental treatment and was not a danger to himself or others, and one said he did not have a mental illness. *Czyz*, 92 Ill. App. 3d at 23-24. At the time, the statute defined "in need of mental treatment" as anyone with a mental disorder, not including people who were "mentally retarded" as defined by the Mental Health Code of 1967. Ill. Rev. Stat. 1977, ch. 91½, § 1-11. If that person, as a result of his or her mental disorder, is "reasonably expected at the time the determination is being made or within a reasonable time thereafter to intentionally or unintentionally physically injure himself [or herself] or other persons, or is unable to care for himself [or herself] so as to guard himself [or herself] from physical injury or to provide for his [or her] own physical needs." Ill. Rev. Stat. 1977, ch. 91½, § 1-11. This definition is much closer to the language necessary for involuntary commitment (405 ILCS 5/1-119 (West 2016)) than the current language of section 5-2-4 of the Unified Code (730 ILCS 5/5-2-4 (West 2016)). Without a psychiatric diagnosis that the defendant was suffering from a mental disorder at the time of the hearing, the appellate court reversed, finding the trial court was in error for concluding he was "in need of mental treatment" as that phrase was defined at the time. *Czyz*, 92 Ill. App. 3d at 27.

¶ 46       In addition, the reference to how the finding must be based on an "explicit medical opinion regarding the [defendant's] future conduct and can not be based upon a mere finding of mental illness" (internal quotation marks omitted) (*Czyz*, 92 Ill. App. 3d at 25) comes from *People v. Sansone*, 18 Ill. App. 3d 315, 323, 309 N.E.2d 733, 739 (1974), which was not even an NGRI case—it was a civil commitment under the then-Mental Health Code of 1967 (Ill. Rev. Stat. 1971, ch. 91½, ¶ 1-1 *et seq.*) and not a commitment hearing under the Unified Code. In *Sansone*, the court noted, without evidence of prior harmful conduct, forced hospitalization was

not the equivalent of preventive detention based on a patient's status as mentally ill. *Sansone*, 18 Ill. App. 3d at 323. As such, the burden was different than in an NGRI case. The court in *Sansone* said, "[a]gain, we reiterate that a finding must be based upon an explicit medical opinion regarding the patient's future conduct and cannot be based upon a mere finding of mental illness." *Sansone*, 18 Ill. App. 3d at 323. The court distinguished criminal detention from detention under the Mental Health Code of 1967 and noted how an involuntary commitment required a medical opinion regarding the patient's future conduct. *Sansone*, 18 Ill. App. 3d at 323-24. The court in *Sansone* was making it clear the burden of proof in an involuntary commitment was not the criminal standard of proof beyond a reasonable doubt nor was it the civil standard of preponderance of the evidence. *Sansone*, 18 Ill. App. 3d at 325-26. They concluded, "[t]he facts upon which a medical opinion is based must be established by clear and convincing evidence, and the medical testimony upon which the decision to commit is based must be clear and convincing." *Sansone*, 18 Ill. App. 3d at 326.

¶ 47　　　　This is relevant because the matter before us is a commitment pursuant to a finding of NGRI in a criminal proceeding, addressed under the Unified Code, a completely different proceeding than a petition for involuntary admission under the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2016)). Further, it is not the initial commitment but a petition for conditional release subsequent to a finding there was a need for commitment, an entirely different proceeding altogether. Section 5-2-4(k) of the Unified Code provides, "[i]n the event of a conflict between this Section and the Mental Health and Developmental Disabilities Code *** the provisions of this Section shall govern." 730 ILCS 5/5-2-4(k) (West 2016). In a civil involuntary commitment, section 1-119 of the Mental Health Code outlines the circumstances that may subject a person to involuntary

admission, which include elements not found in section 5-2-4 of the Unified Code. Under sections 1-119 and 3-807 of the Mental Health Code, a person may be subject to involuntary admission if they are shown by expert testimony (1) to suffer from a mental illness and (2) because of that illness, the person must be treated on an inpatient basis because the individual is (a) otherwise reasonably expected to engage in conduct placing the individual or others in physical harm or the reasonable expectation of harm or (b) unable to provide for his or her basic needs so as to guard against serious harm without assistance. 405 ILCS 5/1-119(1), 1-119(2), 3-807 (West 2016). A person may also be subject to involuntary admission if the person (1) suffers from a mental illness, (2) refuses to adhere adequately to prescribed treatment, (3) is unable to understand the need for treatment, and (4) unless treated on an inpatient basis is reasonably expected to suffer mental or emotional deterioration to the point where the individual would qualify for admission under either of the reasons set forth in section 119(1) and (2) of the Mental Health Code. 405 ILCS 5/1-119(3) (West 2016). More importantly, section 3-807 of the Mental Health Code specifically states,

> "[n]o respondent [in an involuntary commitment proceeding] may be found subject to involuntary admission on an inpatient or outpatient basis unless at least one psychiatrist, clinical social worker, clinical psychologist, or qualified examiner who has examined the respondent testifies in person at the hearing. The respondent may waive the requirement of the testimony subject to the approval of the court." 405 ILCS 5/3-807 (West 2016).

In contrast, " '[i]n need of mental health services on an inpatient basis' " under section 5-2-4(a-1)(B) of the Unified Code means (1) a defendant who has been found not guilty by reason of

- 21 -

insanity but due to a mental illness (2) is reasonably expected to inflict serious physical harm upon himself or herself or another and (3) would either (a) benefit from inpatient care or (b) is in need of inpatient care. 730 ILCS 5/5-2-4(a-1)(B) (West 2016).

¶ 48    The *Czyz* court's use of the quote from *Sansone* is out of context and not particularly applicable to a petition for conditional release in a case under section 5-2-4 of the Unified Code. It gets repeated, however, in later cases relating to NGRI without any distinction. As mentioned above, it appears again in *Robin*, 312 Ill. App. 3d at 716, attributed to *People v. Grant*, 295 Ill. App. 3d 750, 758, 692 N.E.2d 1295, 1300 (1998), an NGRI case prior to an amendment shifting the burden from the State to the defendant, where the trial court denied the recommendation of the director of the Department of Mental Health to conditionally release the defendant. At that time, the burden of proof was on the State when reviewing the determination of the facility director that the defendant was subject to transfer to a nonsecure setting, discharge, or conditional release. 730 ILCS 5/5-2-4(g) (West 1996). If the defendant was petitioning, the burdens of proceeding and proof were on the defendant. 730 ILCS 5/5-2-4(g) (West 1996). In *Grant*, the facility director sent two letters to the court recommending conditional release, the second coming almost two months after the court took no action on the first. *Grant*, 295 Ill. App. 3d at 756. A hearing was not scheduled until almost 10 months later, and in the interim, the defendant also filed a petition for conditional release. *Grant*, 295 Ill. App. 3d at 756. As a result, the State contended on appeal it was confused as to whose burden it was at the hearing since the defendant had petitioned after the facility director's recommendation was sent. *Grant*, 295 Ill. App. 3d at 757. The appellate court found a number of problems with the hearing ultimately conducted, including the fact there should have actually been two separate hearings. *Grant*, 295 Ill. App. 3d at 757. The trial court was found to have initially placed the burden on the State to

prove by clear and convincing evidence defendant should not be discharged, and therefore they were found to be proceeding on the director's request. *Grant*, 295 Ill. App. 3d at 757. To compound the problem, the appellate court in *Grant* also found the trial court, which was initially correct in its assessment of the applicable standard of clear and convincing evidence, ultimately decided the case based on a preponderance of the evidence standard. *Grant*, 295 Ill. App. 3d at 760-61. At the time, the State was obligated to prove by clear and convincing evidence the defendant (1) was subject to involuntary admission or (2) in need of mental health services on an inpatient basis. The previously mentioned *Sansone* quote originating from *Czyz* is found in *Grant* in relation to a request by the facility director to conditionally release an NGRI defendant. *Grant*, 295 Ill. App. 3d at 758. It is cited, however, within the context of what the State must prove to show a defendant is in need of involuntary admission, a term no longer found in section 5-2-4 of the Unified Code, but in the Mental Health Code. Confusing the issue further, this same quote in *Grant* is attributed to *Smith*, 126 Ill. App. 3d at 9, another case upon which defendant relies. In *Smith*, an NGRI defendant was ordered to undergo inpatient care and treatment at the Manteno Mental Health Center (Manteno), but the trial court failed to provide him a *Theim* date (*People v. Theim*, 52 Ill. App. 3d 160, 367 N.E.2d 367 (1977)) or maximum period of commitment to the Department of Mental Health as required by section 5-2-4(b) of the Unified Code. *Smith*, 126 Ill. App. 3d at 6. In that case, the appeal was from the initial order of commitment. *Smith*, 126 Ill. App. 3d at 6. A consulting psychiatrist who had examined the defendant four times and observed his interaction with other patients on a number of occasions gave his opinion that the defendant should be treated on an outpatient basis and that the defendant needed drug abuse counseling, which was not available at Manteno, and he believed the defendant " '[did] not need and would not benefit from further hospital treatment' " and was

" 'not currently suffering from mental illness.' " *Smith*, 126 Ill. App. 3d at 7. Another psychiatrist who interviewed the defendant on several occasions found the defendant did not meet the statutory requirements for involuntary commitment. *Smith*, 126 Ill. App. 3d at 7. He agreed the defendant should not be hospitalized and needed outpatient drug treatment instead. *Smith*, 126 Ill. App. 3d at 7. When questioned by the court, the doctor said the defendant did not meet the statutory requirements for involuntary admission and was not a danger to himself or others. *Smith*, 126 Ill. App. 3d at 7. A social worker testified she believed the defendant was a proper candidate for outpatient treatment since the time of his arrival. *Smith*, 126 Ill. App. 3d at 8. A psychologist at Manteno, who had interviewed the defendant and led his treatment team, concurred with the recommendations of the psychiatrist. *Smith*, 126 Ill. App. 3d at 8. The defendant's mother said he could live with her if released. *Smith*, 126 Ill. App. 3d at 8. There was no other testimony, and the most serious transgression by the defendant while hospitalized of which the witnesses were aware was gambling. *Smith*, 126 Ill. App. 3d at 8.

¶ 49        With no other evidence, the trial court ordered the defendant remanded to the custody of the Department of Mental Health, finding he was not subject to involuntary commitment but was in need of mental health services on an inpatient basis. *Smith*, 126 Ill. App. 3d at 8. Then, the pertinent statute defined " '[i]n need of mental health services on an inpatient basis' " as "a defendant who has been found not guilty by reason of insanity who is not subject to involuntary admission but who is reasonably expected to inflict serious physical harm upon himself [or herself] or another and who would benefit from inpatient care or is in need of inpatient care." Ill. Rev. Stat. 1983, ch. 38, ¶ 1005-2-4(a)(1)(B). The burdens of proceeding and proof were on the State. Ill. Rev. Stat. 1983, ch. 38, ¶ 1005-2-4(g).

¶ 50          When discussing the State's burden of proof, the appellate court said, " 'the finding must be based upon an explicit medical opinion regarding the [defendant's] future conduct, and can not be based upon a mere finding of mental illness.' " (Internal quotation marks omitted.) *Smith*, 126 Ill. App. 3d at 9 (quoting *Czyz*, 92 Ill. App. 3d at 25). They then outlined a series of circumstances that would not be sufficient to sustain a finding *requiring involuntary commitment*. *Smith*, 126 Ill. App. 3d at 9-10. These circumstances have served as a road map for defendant in our case, morphing into bases she contends are insufficient to sustain a finding denying conditional release for an NGRI defendant. In fact, the statement in defendant's opening brief that "speculation that a defendant might resume the use of alcohol or drugs in the community is an insufficient basis to deny conditional release" is supported by reference to *Smith* but not as a quote. The reason is simple: defendant has taken the language from *Smith* and replaced the words "not sufficient to sustain a finding requiring involuntary commitment" (*Smith*, 126 Ill. App. 3d at 9) with "an insufficient basis to deny conditional release." This is not merely inaccurate—it is disingenuous. Clearly the two are not synonymous and would not be since involuntary commitment is addressed differently in the Mental Health Code.

¶ 51          Under the circumstances that existed at the time of *Grant*, the need for "an explicit medical opinion regarding the defendant's future conduct" is understandable. *Grant*, 295 Ill. App. 3d at 758. At that time, the director of the mental health facility where the defendant was housed determined whether the defendant was no longer in need of inpatient services and should either be transferred to a nonsecure setting, conditionally released, or discharged. 730 ILCS 5/5-2-4(g) (West 1996). Merely finding the defendant to be suffering from a mental illness would not meet a burden to show he is " '[s]ubject to involuntary admission,' " *i.e.*, "mentally ill and who because of his [or her] mental illness is either reasonably expected to inflict serious

physical harm upon himself [or herself] or another in the near future" or "is unable to provide for his [or her] basic physical needs." 730 ILCS 5/5-2-4(a)(1)(A)(i), (ii) (West 1996). This is a different burden than currently exists, as "subject to involuntary admission" was expressly removed from the statute by Public Act 93-473, enacted August 8, 2003. See Pub. Act 93-473, § 5 (eff. Aug. 8, 2003) (amending 730 ILCS 5/5-2-4). Alternatively, the State would have had to show the defendant was " '[i]n need of mental health services on an inpatient basis,' " *i.e.*, "a defendant *** not subject to involuntary admission but who is reasonably expected to inflict serious physical harm upon himself [or herself] or another and who would benefit from inpatient care or is in need of inpatient care." 730 ILCS 5/5-2-4(a)(1)(B) (West 1996). The amendment of Public Act 93-473 removed "subject to involuntary admission," leaving "in need of mental health services on an inpatient basis." Pub. Act 93-473, § 5 (eff. Aug. 8, 2003).

¶ 52 The removal of the language "subject to involuntary admission" is significant since, as noted above, involuntary admission *requires*, by statute, expert testimony in order to meet the threshold necessary for the court to consider involuntary commitment. Although not expressly required by statute, it is difficult to envision a situation where an NGRI defendant petitioning for conditional release could meet his or her burden without such testimony. The court, however, is not required to accept the expert's testimony blindly. Unfortunately, the faulty logic even made it to our supreme court, as many appellate courts have not distinguished the civil commitment and criminal commitment requirements for experts. See *Jurisec*, 199 Ill. 2d at 123. " '[I]t is the trier of fact, and not the psychiatrists, who is to consider and weigh all the evidence in this case.' " *People v. Cross*, 301 Ill. App. 3d 901, 911, 704 N.E.2d 766, 772 (1998) (quoting *People v. Williams*, 140 Ill. App. 3d 216, 226, 488 N.E.2d 649, 655 (1986)); see also *People v. Wolst*, 347 Ill. App. 3d 782, 808 N.E.2d 534 (2004). When deciding whether defendant

has met her burden, the trial court is not limited to the testimony of the three experts. See *People v. Hoffmann*, 140 Ill. App. 3d 1056, 1065, 489 N.E.2d 460, 466 (1986) ("In making its decision on the petition, the trial court may consider and give weight to evidence other than the testimony of the experts."). In fact, when deciding a petition for conditional release, the conduct of the defendant that was the subject of the criminal prosecution is highly relevant to the issue of the reasonable expectation of defendant's dangerousness. *Hoffmann*, 140 Ill. App. 3d at 1065 (citing *People v. Gann*, 94 Ill. App. 3d 1100, 1107, 419 N.E.2d 613, 618 (1981)).

¶ 53    In *Cross*, the defendant was found NGRI after killing two women and attempting to kill a third along with her husband after invading their home to kill "witches and warlords [warlocks]" while acting under supposed orders from God. *Cross*, 301 Ill. App. 3d at 903. He appealed the trial court's denial of the mental health center director's recommendation he receive certain supervised off-grounds passes after 15 years of inpatient treatment at Elgin Mental Health Center. *Cross*, 301 Ill. App. 3d at 908. Both the director and the defendant's treatment team were recommending these passes. *Cross*, 301 Ill. App. 3d at 903-04. At the hearing on the recommendation, the defendant presented two witnesses. *Cross*, 301 Ill. App. 3d at 904-07. Albert Stipes, M.D., a forensic psychiatrist, opined the "defendant was not a risk to harm himself or others, able to 'provide for his basic physical need as to guard himself from serious harm,' not subject to involuntary admission, and ready for the type of passes requested." *Cross*, 301 Ill. App. 3d at 904. He was also of the opinion "the passes would not interfere with defendant's medication or treatment, would enhance his treatment, would not lead to a resumption of drug use, would not lead to an escape, and would provide reasonable assurances of public safety." *Cross*, 301 Ill. App. 3d at 904. The doctor was of the opinion the passes were necessary to assure defendant's progress in treatment. *Cross*, 301 Ill. App. 3d at 904. In fairness, on cross-

examination, Dr. Stipes acknowledged a number of negative incidents far more serious than any mentioned about defendant in our case, and the defendant in *Cross* had, shortly before the date of the hearing, expressed his opinion he was no longer in need of treatment. *Cross*, 301 Ill. App. 3d at 904-05. These facts, although different from our case, are not relevant to the salient points of the case, however, as will be seen below.

¶ 54        The second and only other witness in that case was the defendant's individual counselor who had been working with him for the previous two years, Raymond Sipowicz, a psychologist. *Cross*, 301 Ill. App. 3d at 905. After working with the defendant weekly, the counselor found him to be much more expressive and concerned about what was going on with himself and his behavior. *Cross*, 301 Ill. App. 3d at 905. The counselor's recommendation in favor of supervised off-grounds passes came as a result of both his direct involvement with the defendant as well as his review of all the defendant's records. *Cross*, 301 Ill. App. 3d at 905. He also was of the opinion the passes "would not interfere with defendant's continued medication, cause him to resume using illegal drugs, cause him to harm himself or others, or pose a threat to public safety," and they would further his treatment. *Cross*, 301 Ill. App. 3d at 905. Sipowicz said the defendant had already been granted on-grounds passes, and during that time, he followed the rules and never attempted to escape or injure himself or others and the passes were beneficial to his integration treatment. *Cross*, 301 Ill. App. 3d at 905-06. Sipowicz also said the director's recommendation came as a result of an evaluation of the defendant by the Isaac Ray Center and their work with the defendant's treatment team. *Cross*, 301 Ill. App. 3d at 906.

¶ 55        Again, on cross-examination, the State was able to bring out a number of negative incidents, failures to take medication or cooperate with treatment at times, threats to staff, and lack of involvement or minimal participation in treatment. *Cross*, 301 Ill. App. 3d at 906.

¶ 56    The trial court denied the passes based only on the testimony of the defendant's witnesses, who, as a basis for their opinions, expressed in much stronger terms than the witnesses here their professional opinions regarding the positive therapeutic benefits to granting the passes. In addition, the witnesses in *Cross* testified far more emphatically about the lack of possible relapse or return to dangerous behavior by the defendant if granted the passes, including expressing their opinions that denial of the passes would detrimentally affect the defendant's progress in treatment, an opinion noticeably absent here. In the case before us, Dr. Eberhardt acknowledged defendant's status was based upon her current circumstances; *i.e.*, where she was in treatment "at this time," in a closed, controlled environment, with regimented medication distribution and no access to outside influences or street drugs.

¶ 57    As in our case, the defendant in *Cross* sought to argue the trial court's decision was against the manifest weight of the evidence "because all the witnesses recommended granting the passes and because '[n]o evidence was presented to indicate that the passes would put *** [defendant] or the public in danger.' " *Cross*, 301 Ill. App. 3d at 910-11. Further, the defendant in *Cross* contended there was no evidence to indicate the passes would have a negative impact on his treatment and, instead, there was affirmative evidence a denial would interfere with his continued progress. *Cross*, 301 Ill. App. 3d at 911. The State argued the trial court was required to consider all the evidence and make a determination independent of the recommendations. *Cross*, 301 Ill. App. 3d at 911.

¶ 58    The First District noted how the statute gave the trial court the discretion to grant the requested passes and did not mandate the trial court grant pass privileges solely on the basis of the treatment team's and director's recommendations. *Cross*, 301 Ill. App. 3d at 910. Correlatively, here, under section 5-2-4(e) of the Unified Code, once a defendant petitions for

conditional release, the court is required to hold a hearing. 730 ILCS 5/5-2-4(e) (West 2016). However, subsection (g) provides for the court's findings to be established by clear and convincing evidence, considering a nonexhaustive list of factors, which includes "any other factor or factors the Court deems appropriate." 730 ILCS 5/5-2-4(g)(1)-(12) (West 2016). The only mandatory requirements placed on the court are found in subsection (h) and are contingent on the court making certain findings "consistent with the provisions of this Section." 730 ILCS 5/5-2-4(h) (West 2016). There is nothing in the statute requiring the court to accept the experts' testimony. When they discussed this issue, the court in *Cross* held, "[e]ven though the experts provided their opinions concerning defendant's rationale concerning these problems [(the negative behaviors brought out on cross-examination)], it was for the trial court to weigh these opinions with the other evidence and draw its own conclusions." *Cross*, 301 Ill. App. 3d at 911. The experts in *Cross* were unanimous in their opinion the defendant should be granted passes. In spite of that, the court was free to decide otherwise. The same is true here. Regardless of how consistent the experts may have been with regard to either element of "risk of harm" or "need or benefit of further inpatient treatment," the court in this case was free to decide otherwise if it reasonably believed there was credible evidence sufficient to preclude a finding for defendant by clear and convincing evidence.

¶ 59        In *Williams*, an NGRI defendant was found subject to involuntary admission and appealed on the same basis as defendant here; there was no "explicit medical opinion" that he was reasonably expected to harm himself or others. *Williams*, 140 Ill. App. 3d at 225-26. The First District found, although the opinions of the doctors were in conflict, it was a matter for the trial court to determine in weighing all the evidence, citing the language referenced above. *Williams*, 140 Ill. App. 3d at 226. It is clear, therefore, the trial court was not bound by the

testimony of the experts nor does the statute require an expert opinion in order to deny a petition for conditional discharge, contrary to the assertions of defendant.

¶ 60 In *Wolst*, 347 Ill. App. 3d at 784, the defendant shot and killed a stranger in a health club while under the delusion the victim was a federal agent. As the defendant was suffering from paranoid schizophrenia, he was initially found unfit to stand trial. *Wolst*, 347 Ill. App. 3d at 784. After being returned to fitness, he was found NGRI and committed to the Elgin Mental Health Center. *Wolst*, 347 Ill. App. 3d at 784. Slightly over four years later, the facility director recommended transfer to a nonsecure setting, as well as the granting of supervised off-grounds and unsupervised on-grounds passes. *Wolst*, 347 Ill. App. 3d at 784-85. The defendant petitioned for the same. *Wolst*, 347 Ill. App. 3d at 785. The trial court denied the transfer and request for supervised off-ground passes but granted the unsupervised on-grounds pass privileges, and defendant appealed. *Wolst*, 347 Ill. App. 3d at 785. Among other issues not relevant to the matter before us, the appellate court was asked to determine whether the court's ruling was against the manifest weight of the evidence since each of defendant's four witnesses recommended all three privileges. *Wolst*, 347 Ill. App. 3d at 785. A social worker, two staff psychiatrists with the Cook County court's forensic medical services, and one staff psychiatrist for Elgin Mental Health Center testified the defendant was not a threat to himself or anyone else; was no longer suffering delusions; and, due to his medication, his paranoid schizophrenia was in remission. *Wolst*, 347 Ill. App. 3d at 785-89. He was considered one of the most "stable" and "appropriate" patients on the unit. *Wolst*, 347 Ill. App. 3d at 785-89. They did not believe the transfer or passes posed a risk or danger to the defendant or others and that they would be beneficial to the defendant's treatment. *Wolst*, 347 Ill. App. 3d at 785-89. All of the doctors

indicated their opinions were contingent on defendant's continued compliance with medication. *Wolst*, 347 Ill. App. 3d at 785-89.

¶ 61 Much like the trial court here, the trial judge in *Wolst* acknowledged the defendant's substantial progress with medication and noted it was an integral part of his treatment. *Wolst*, 347 Ill. App. 3d at 789-90. However, the court felt the need to observe how the defendant did with the unsupervised on-grounds passes before advancing to off-grounds and a transfer, just as the clinical team did for defendant here. *Wolst*, 347 Ill. App. 3d at 790. The trial court in *Wolst* was also concerned about the lack of information regarding how the transfer and off-grounds passes would be monitored or supervised and recognized both the need for continued medication and the risk of " 'grave consequences' " if there was a relapse, much like the trial court here. *Wolst*, 347 Ill. App. 3d at 790.

¶ 62 The First District said the trial court's determination regarding whether a defendant has carried his burden under section 5-2-4(g) by clear and convincing evidence "must be respected unless such determination is against the manifest weight of the evidence." *Wolst*, 347 Ill. App. 3d at 790 (citing *Cross*, 301 Ill. App. 3d at 908-09). For a decision to be "against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trier of fact is clearly evident." *Wolst*, 347 Ill. App. 3d at 790. The court found the record provided ample support for the court's decision in that "[t]he record makes clear that the trial court's primary concern was that [the] defendant, when placed in a less secure environment and charged with taking his own medication, might fail to do so and relapse." *Wolst*, 347 Ill. App. 3d at 791. The court also noted, although all the witnesses supported defendant's requests, they also acknowledged the possibility of relapse with the concomitant potential for dangerous behavior if the defendant stopped taking his medication. The appellate court also found section 5-2-4(g)

gave the trial court broad discretion in determining whether a defendant remains mentally ill and dangerous, citing the court's language in *Cross*, which found the responsibility for considering and weighing the evidence lies with the fact finder and not the psychiatrist. *Wolst*, 347 Ill. App. 3d at 790.

¶ 63　　　　The defendant in *People v. Bethke*, 2016 IL App (1st) 150555, 55 N.E.3d 244, citing *Blumenshine*, 72 Ill. App. 3d 949, contended the trial court should not disregard the testimony of two expert witnesses who agreed he was suitable for off-grounds pass privileges. We find *Blumenshine* as unpersuasive as did the First District in *Bethke*. Unlike the case before us, in *Blumenshine*, all the defendant's witnesses *and* the State concurred in the recommendation for conditional discharge. *Blumenshine*, 72 Ill. App. 3d 949. Here, as in *Bethke*, the State opposed the petition and cross-examined defendant's witnesses extensively on all aspects of defendant's treatment history, progress, and prognosis. Also similar to *Bethke*, the experts here had to acknowledge defendant engaged in a series of rule violations created primarily by her relationship with a male patient and her frustration with how that relationship was being treated by hospital staff. Although considered small or minor violations, it was significant to the court that they occurred during the period of time defendant was working toward a conditional discharge petition. In *Bethke*, the First District noted similar timing and found it significant not only to the trial court but to the appellate court as well.

¶ 64　　　　　　　　　　C. Trial Court's Analysis

¶ 65　　　　In light of the above, we review defendant's argument the trial court's judgment was manifestly erroneous and disagree.

¶ 66　　　　Under section 5-2-4(g) of the Unified Code, a defendant is required to prove by clear and convincing evidence conditional release is appropriate. 730 ILCS 5/5-2-4(g) (West

2016). "The trial court's determination as to whether a defendant has carried his burden under section 5-2-4(g) by clear and convincing evidence must be respected unless such determination is against the manifest weight of the evidence." *Wolst*, 347 Ill. App. 3d at 790. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006).

¶ 67 Defendant contends various individual factors addressed by both the experts and the court cannot, by themselves, be the basis for denying conditional discharge. She does so without either acknowledging or recognizing the factors she identifies, when considered together in conjunction with others, may indeed permit the court to conclude defendant should not be conditionally discharged at this time. Defendant's primary contention is made clear in her reply brief when she claims "if all the experts agree that a patient is stable, not dangerous, and likely to continue treatment in the community—as defendant's three experts did—the mere possibility that the patient could stop taking medication or abuse drugs and then engage in dangerous behavior cannot meet the inpatient standard." Such an argument erroneously presumes the trial court's only basis for declining to accept the recommendations of defendant's witnesses was "the mere possibility" defendant might stop taking her medication and return to street drugs. Defendant ignores completely the fact her treating psychiatrist and her treatment team were not supportive of conditional release and believed she needed more time with inpatient treatment. This is so, in spite of defendant's professed understanding of her circumstances and apparent commitment to meaningful participation in treatment. Defendant also discounts the possibility the trial court recognized that even though her treatment providers spoke about her progress in very positive terms, they were also of the opinion further mental health treatment within the

hospital setting would be beneficial in assessing the level of her commitment to continued mental health treatment and abstinence from street drugs.

¶ 68 Recognizing the speed with which defendant's psychosis and resultant dangerous or self-destructive behavior could recur upon relapse, the trial court may well have placed greater weight on the reasoned and unanimous agreement of her treatment team that she should not be conditionally released yet. When the court considered the average of three hospitalizations per year over the past 10 years, the court could have concluded the concerns of Dr. Eberhardt and the treatment team were well-founded, especially in light of the fact Dr. Eberhardt was careful to qualify her opinions concerning defendant's mental condition and progress by indicating the status "at this time." While in a controlled environment, with the regulated administration of medication without access to street drugs or alcohol, defendant was progressing well and did not appear to be likely to be a danger to herself or others at that moment. Even Dr. Finkenbine's report was careful to qualify his opinion by noting, "[h]er clinical status is absent any signs or symptoms of mental illness and therefore the inpatient setting is not 'needed' in the same sense as would be recommended or necessary for the management of acute mania, active delusions, thoughts of suicide or severe depression or anxiety. Continuous inpatient psychiatric hospitalization is usually and eventually counterbalanced by the benefits of a less restrictive setting, personal liberty, and individual freedom." In effect, he was saying she was not currently exhibiting the acute symptoms and behavior, which might be the basis for an order of involuntary admission and therefore the consideration of conditional release. However, that is not her circumstance, as this is not a case of involuntary admission. As shown above, this conclusion is based upon a misunderstanding of the criteria for conditional release of an NGRI defendant.

¶ 69       It is not unreasonable to believe the trial court recognized the repetitive nature of defendant's hospitalizations as caused by her repeated release upon stabilization, only to return to self-destructive and, at times, seriously dangerous behavior created by her psychosis. Each of the witnesses noted this forced hospitalization had been her longest and posited it may have allowed her to begin facing the seriousness of her mental and substance-abuse issues. The refusal of her psychiatrist and treatment team to recommend immediate conditional release was only an effort to ascertain whether, with more freedom within the hospital setting, defendant would continue to exhibit rehabilitative behavior reflecting an understanding and internalization of what she was learning. They undoubtedly would agree with Dr. Finkenbine's statement about the counterbalancing of psychiatric hospitalization with "less restrictive settings, personal liberty, and individual freedom"; they just did not believe she was ready yet.

¶ 70       Defendant lists "four grounds" that she says were the only bases cited by the trial court as justification for denial of the petition, without citation to the record. In fact, the court referenced the four reasons why defendant continues to benefit from mental health services on an inpatient basis listed by the treatment team in their August 2017 report. However, they are not the same reasons listed by defendant. In addition, those reasons mentioned by the team were in no way the only factors considered by the court in its ruling. Defendant listed the first factor relied upon by the court as "[defendant's] lack of exposure to a non-controlled environment since being confined at McFarland." Instead, the first factor listed by the team and referenced by the court was defendant's history of manic and psychotic behavior related to active symptoms of her bipolar I disorder. It is true the witnesses were asked about defendant's performance and behavior in a strictly controlled and monitored environment. It is equally true the trial court was concerned about how that may translate into the significantly less structured environment of a

halfway house for perhaps no more than 30 days before being reintegrated into the community. However, "the current state of the defendant's illness," "the length of time it would take for the defendant's mental health to deteriorate if the defendant stopped taking prescribed medication," and "the defendant's potential to be a danger to himself, herself, or others" are all specifically referenced in section 5-2-4(g)(3), (6), and (11) of the Unified Code as factors the court may consider. 730 ILCS 5/5-2-4(g)(3), (6), (11) (West 2016). Rather than constituting an unreasonable basis for the ruling, it is expressly provided for by statute. In addition, the court was permitted to, and did, consider the long history of repeated hospitalizations and defendant's history of extensive alcohol and drug abuse—again, a permitted consideration under section 5-2-4(g)(7) and (12) of the Unified Code. 730 ILCS 5/5-2-4(g)(7), (12) (West 2016).

¶ 71    The second factor listed by defendant was "the potential that [defendant] may engage in unacceptable behavior once released into the community," which, in reality, is the same as her first factor, just worded differently. The second factor of the treatment team was defendant's "history of substance abuse," which has already been discussed and is a listed factor for consideration by the trial court.

¶ 72    The third factor argued by defendant as one of the four forming the basis for the court's denial of her petition was "that [defendant] lacks a finalized conditional release plan." Admittedly, this is the fourth factor listed by the team, "[defendant] does not have a feasible plan for community reintegration." This was understandable in light of the evidence that until suggested otherwise, her intention had been simply to return to live in an apartment obtained for her by her father. The more realistic possibility of residing in a group home had not even occurred to defendant until suggested by either Dr. Finkenbine or someone else at or around the evaluation in August 2017, since that is the first time it is referenced in the record. This was also

noticed by the trial court and evident in its questions regarding her recent acceleration of her involvement in formulating plans.

¶ 73    Dr. Finkenbine's report even noted, although defendant was requesting conditional release, there was no evidence of any significant discharge planning, nor did defendant have any specific community support plan. This information came from an interview conducted on August 8, 2017, after her petition was filed and while she awaited a hearing. Defendant cited *Smith*, 126 Ill. App. 3d 5, for the proposition that "the lack of a finalized conditional release plan *** is an insufficient basis to deny conditional release," once again juxtaposing "conditional release" with "involuntary commitment," which was the holding in *Smith*. As we have stated, *Smith* was a direct appeal of an NGRI inpatient care and treatment order where the State's witnesses unanimously recommended defendant's release. Considering the State had the burden of proof as the defendant was being involuntarily committed, it is understandable the court found "[e]xpert testimony that defendant may have difficulty adjusting to the stresses of noninstitutional life is not sufficient to sustain a finding requiring involuntary commitment." *Smith*, 126 Ill. App. 3d at 9 (citing *Czyz*, 92 Ill. App. 3d at 26-27). There is very little about *Smith* that relates to the case before this court. Defendant seeks support in *Smith* again regarding her claim the trial court speculated defendant might return to the use of alcohol or drugs upon her return to the community, contending such speculation is not sufficient, on its own, to form the basis for denying conditional release. However, once again, she substituted "conditional release" for "involuntary commitment." In fact, "the defendant's history or potential for alcohol and drug abuse" is one of the nonexclusive factors listed in subsection (g) of the Unified Code and is therefore relevant to a court's consideration when hearing a petition for conditional release. 730 ILCS 5/5-2-4(g)(7) (2016).

¶ 74    The final factor listed by defendant is actually the one upon which the trial court gave substantial deference—the fact that defendant's own treatment team was of the opinion she would continue to benefit from inpatient mental health services and was not recommending conditional release. Here, defendant confuses the statute's provision for alternative methods of petitioning for conditional release with elements of proof. Whether petitioned by the facility director or the individual, the trial court is still invested with the responsibility to consider the evidence. The recommendation of the facility director or the treatment team is merely one factor to consider. The trial court did not, and should not, consider it dispositive. See *Hoffman*, 140 Ill. App. 3d at 1065 ("In making its decision on the petition, the trial court may consider and give weight to evidence other than the testimony of the experts.").

¶ 75    As the trial court noted, defendant had only as recently as July 2017 "begun working on a relapse prevention plan in order to develop a realistic plan on how to maintain sobriety in the community." This was only two months before her hearing and coincided with when she began a parenting course required for her DCFS case. These were all things the court could reasonably consider when assessing the strength of defendant's commitment to treatment. This is especially true when considering defendant had been hospitalized 30 times in the last 10 years because of a continued inability or unwillingness to stop using street drugs and alcohol coupled with either a failure or inability to fully appreciate the seriousness of her mental issues. There is enough in the record to find it was not against the manifest weight of the evidence to find defendant remains a reasonable danger to herself or others and that she continues to benefit from inpatient treatment. Those factors, which clearly weighed against her, included her long history of substance abuse, both drug and alcohol; her repeated failures or refusals to comply with her mental health treatment and medication when not hospitalized; her lack of any

reasonable plan for her release as well as little evidence of family support; and the fact that, if she returned to abusing drugs and alcohol as she had so many times in the past, her mental condition could deteriorate very rapidly, according to at least one doctor, in a matter of one or two days. This was coupled with the trial court's reasonable concern defendant's professed cooperation and intention to continue treatment on her own was fueled more by her desire to present a good picture of herself to DCFS because of the impending case involving her daughter than due to any serious intention to do so.

¶ 76     Based upon the evidence, the trial court gave proper consideration to the factors listed in section 5-2-4(g) of the Unified Code, weighed the testimony of the experts, and properly considered the reports and recommendations of the treatment team. This record does not permit us to find the trial court's finding was against the manifest weight of the evidence. Could other fact finders consider the same evidence and reach a different conclusion? Possibly—however, that is not our standard of review. "[T]he reviewing court must give deference to the trial court's decision and cannot set that decision aside because it, applying the [clear and convincing evidence] standard, would have ruled differently." (Internal quotation marks omitted.) *People v. Ferguson*, 238 Ill. App. 3d 448, 455, 603 N.E.2d 1257, 1261 (1992).

¶ 77                              D. Application of Legal Standard

¶ 78     Defendant argues the trial court used a stricter standard than legally required. We disagree.

¶ 79     By selectively extracting words of the court out of context, defendant contends this somehow meant the trial court applied a higher or stricter standard than is required under the Unified Code. Defendant's argument is unsupported by authority in either brief. She recites no case law in support of her contention the trial court has somehow applied a different or

inappropriate standard because it did not expressly use the words "reasonably expected" or "reasonable expectation" when assessing the potential for harm to herself or others. As such, she has forfeited this argument under Illinois Supreme Court Rule 341(h)(7) (eff. Nov. 1, 2017). See *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 31, 989 N.E.2d 224 (an argument raised on appeal but not supported by citation to relevant authority is forfeited under Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008)). However, since this rule is an admonishment to the parties and not a limitation on this court's jurisdiction, we may address an issue in order to achieve a just result and the need for a sound and uniform body of precedent. *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, 58 Ill. App. 3d 28, 31, 373 N.E.2d 772, 774 (1978). We choose to do so here.

¶ 80        Just as in *Bethke*, defendant here contends the trial court applied the wrong legal standard. In *Bethke*, the defendant contended the trial court's decision was based on an unwillingness to take any risk whatsoever, thereby making it impossible for anyone in the defendant's position to secure conditional discharge since psychiatry does not deal in such absolutes when predicting future behavior. *Bethke*, 2016 IL App (1st) 150555, ¶ 30. Here, defendant contended the trial court applied a different and stricter standard for continued confinement due to comments the court made during its oral ruling from the bench. Contrary to defendant's assertion, the court agreed with defense counsel's representation of the applicable legal standard:

> "You're right in indicating what the law is to the Court, [defense counsel], and that is that the court must find that there is a need for further in-patient treatment, and that whether or not it's been

shown that the Defendant would be at risk to seriously harm herself or others."

The trial court also expressly found:

"[T]hat's not been shown by clear and convincing evidence at this hearing, that [defendant] is not in danger of seriously injuring herself or others if she were to be conditionally released from the McFarland Mental Health Center."

¶ 81    The trial court, when entering its order, noted, in addition to the opinions expressed by the doctors, the court had the reports of Dr. Finkenbine, the August 23, 2017, NGRI 60-day-treatment-plan report, all the reports filed previously, and Dr. Lawrence L. Jeckel's fitness report of December 9, 2015. It is true Dr. Eberhardt expressed the opinion defendant did not meet the criteria for involuntary commitment; however, as we now see, that is not the standard by which her eligibility for conditional release was to be determined. The doctor was asked whether defendant was "at this time" "reasonably expected to inflict serious physical harm upon herself." She responded, "she's not in imminent risk to hurt herself or others," indicating this was due to defendant's current compliance with medication and lack of access to alcohol and street drugs as a result of her inpatient status. When asked specifically if defendant was "an appropriate candidate for conditional release," Dr. Eberhardt's response was, "I think that she does not meet the criteria for in-patient hospitalization. If [defendant] were a civil patient, she would have been discharged already." True as that may be, neither opinion is sufficient to require the court to order defendant's conditional release. This is especially so since Dr. Eberhardt said neither she nor the other members of the treatment team were recommending conditional discharge and defendant would benefit from continued inpatient treatment.

Defendant is not being evaluated as a person under a civil commitment through the Mental Health Code but as a petitioner for conditional release pursuant to the Unified Code.

¶ 82 The treatment team recognized the substantial risk caused by early release in an essentially unstructured environment, especially in light of the fact that as late as August 2017, one month before the hearing on her petition, defendant "continued to struggle with inappropriate boundaries with a male peer from another unit with whom she stated she was in a relationship with," according to the August 23, 2017, report. She distracted other peers on numerous occasions, and when required to sit across the room from the male peer, her difficulty with compliance resulted in, on one occasion, her leaving the group rather than complying. Defendant had gone so far as to "challenge another unit's treatment team's recommendations regarding the same male patient and when confronted, made inappropriate comments" to staff. As the trial court noted, although seemingly trivial, in the larger scheme of things, it found defendant's behavior troubling as it occurred shortly before the discharge hearing she knew was coming and after she had supposedly been doing so well with all treatment modalities.

¶ 83 It was not improper for the trial court to consider the fact defendant engaged in such behavior within the structured environment while on scheduled and monitored medication and without access to alcohol or street drugs. Defendant had been receiving intensive mental health and substance-abuse treatment for an extended period of time, longer than she had ever remained hospitalized before. However, within a month of an upcoming conditional discharge hearing, she was engaging in behavior that violated rules within the facility. As Dr. Eberhardt noted in her testimony, "if they don't follow the small rules at McFarland, they won't follow the big rules outside." The fact that defendant had failed to show she could follow rules in a

controlled setting undoubtedly contributed to the opinion of Dr. Eberhardt and the treatment team that defendant "continues to benefit from mental health services on an inpatient basis."

¶ 84 By parsing the words of the court, defendant argued application of an inappropriate or incorrect standard of proof. Instead, the court made clear its concerns about defendant's behavior should she be released prematurely. The court expressly found defendant had failed to show by clear and convincing evidence she would not be in danger of seriously injuring herself or others if she were conditionally released at this time. This is the proper standard applicable to the defendant's burden of proof in these proceedings. Section 5-2-4(g) of the Unified Code provides the only standard of review applicable to this section, requiring "[t]he findings of the Court shall be established by clear and convincing evidence." 730 ILCS 5/5-2-4(g) (West 2016). Clear and convincing evidence has been defined as "the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *In re Estate of Ragen*, 79 Ill. App. 3d 8, 14, 398 N.E.2d 198, 203 (1979).

¶ 85 The trial court agreed the burden was on defendant to show by clear and convincing evidence she was not "at risk" to seriously harm herself or others and was not in need of further inpatient treatment. This is consistent with the case law. See *People v. Gunderson*, 2017 IL App (1st) 153533, ¶ 19, 82 N.E.3d 677 (section 5-2-4(g) of the Unified Code requires a defendant who seeks discharge to prove by clear and convincing evidence that he or she has no mental illness or that he or she is not dangerous). Subsection (g) makes no distinction between the burden for discharge and that for conditional release. In our case, after explaining the rationale underlying its ultimate finding, the court concluded, "that's not been shown by clear and convincing evidence at this hearing, that [defendant] is not in danger of seriously injuring herself or others if she was to be conditionally released from the McFarland Mental Health

Center." The court had already noted how all of the experts acknowledged defendant would benefit from further mental health treatment but her treatment team was of the opinion she was not ready for conditional release just yet.

¶ 86    Defendant is troubled by certain words the court used when making its ruling:

"[t]he Court has to be absolutely sure in its mind that when a Defendant is released from the McFarland Center, or any center that has that much of a controlled environment, that there is in the court's mind no risk that any future serious harm may be committed.

\*\*\*

The Court, in my mind, has to be sure this type of thing [defendant relapsing on drugs and alcohol, thereby exacerbating her bipolar 1 disorder symptoms and engaging in behavior dangerous to herself or others] is not going to happen."

Defendant contends this means the court used a higher, inappropriate legal standard, an argument which, as we noted, defendant has forfeited. However, defendant's argument misses the point. The reason the burden remains on the defendant is because there has already been a determination the defendant was dangerous. She committed a serious felony offense and had been found NGRI. In other words, the trier of fact has determined she committed the criminal offense charged and she was suffering from a mental illness. "[T]he insanity verdict in and of itself supports the conclusion that the insanity acquittee continues to be mentally ill and dangerous." (Internal quotation marks omitted.) *Gunderson*, 2017 IL App (1st) 153533, ¶ 21.

¶ 87    In spite of this language, the trial court specifically set forth the standard under which it was to decide the case, and it stated on the record its finding was by "clear and

convincing evidence." Our supreme court has said a reviewing court "presume[s] that the trial judge knows and follows the law unless the record indicates otherwise." *People v. Gaultney*, 174 Ill. 2d 410, 420, 675 N.E.2d 102, 107 (1996). We presume the same, and nothing in the record affirmatively rebuts that presumption. The language of concern to defendant must be looked at in context. The trial court engaged in a thoughtful analysis of the evidence, outlining many of its concerns about defendant's history, progress in treatment, recent troubling behavior, and repeated hospitalizations for the same reasons over a 10-year period. The court properly considered the testimony of the experts and, understandably, gave great weight to the fact defendant's treatment team was not ready to recommend conditional discharge until they had an opportunity to observe defendant's behavior in a less supervised setting, in light of her previous violations in the facility. The court noted, "the problem I have here is that this Defendant's history has shown that when she goes off, she goes off fast and her actions as a result of that are dangerous," as a significant and reasonable concern. We cannot say the court used the wrong legal standard.

¶ 88                                III. CONCLUSION

¶ 89          For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment (55 ILCS 5/4-2002(a) (West 2016)).

¶ 90          Affirmed.