NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230928-U

NOS. 4-23-0928

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 3, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| THOMAS JEFFERSON MEECE, | ) | No. 09CF755 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Amy L. McFarland, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The denial of defendant's petition for conditional release is not against the
manifest weight of the evidence.

¶ 2    In September 2010, defendant, Thomas Jefferson Meece, was found not guilty by

reason of insanity for the first degree murder of his 18-month-old daughter. He was remanded to

the custody of the Illinois Department of Human Services. In March 2023, defendant petitioned

for conditional release under section 5-2-4(e) of the Unified Code of Corrections (Code) (730

ILCS 5/5-2-4(e) (West 2022)). After a hearing, the trial court denied the petition. Defendant

appeals, arguing the denial is against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In August 2023, the trial court held a hearing on defendant's petition for

conditional release.

¶ 5        At that hearing, the trial court began the proceedings by noting a July 2023 forensic psychiatric evaluation had been filed. The evaluation summarized the findings of Terry M. Killian, MD, a clinical associate professor of psychiatry with Southern Illinois University School of Medicine. According to the report, Dr. Killian was referred for a second opinion as to the appropriateness of defendant's conditional discharge after the verdict of not guilty by reason of insanity on the 2009 first degree murder charges for the beating death of his daughter. Dr. Killian interviewed defendant via Zoom for approximately 90 minutes in June 2023. At that time, defendant was housed at Elgin Mental Health Center in Elgin, Illinois (Elgin MHC).

¶ 6        According to Dr. Killian, he first evaluated defendant in May 2006, three years before the offense that led to defendant's confinement. At that time, defendant had been charged with multiple offenses, including driving while his license was revoked, driving under the influence of alcohol, and reckless driving. Defendant reported having gone to various police departments "to get rid of the sneak and peek A/V system that he believed had been placed in his house and with which he believed himself to have been tortured for three years, 24 hours a day." Defendant appeared "quite delusional with a complex set of delusions which had a primarily paranoid theme." Defendant heard voices and had delusions involving US Insulation, for whom defendant had worked for approximately 18 years.

¶ 7        After defendant's daughter's death, Dr. Killian examined defendant in October 2009 and found him unfit to stand trial due to his psychotic symptoms at both the time of trial and of the murder. Defendant stood trial in December 2010. After his not guilty by reason of insanity verdict, defendant was transferred to Elgin MHC. Approximately four years later, Elgin MHC staff recommended him for conditional release. In September 2019, defendant was released from Elgin MHC and transferred to a facility in Springfield, Illinois, on

conditional-release status. In March 2022, defendant's conditional release was revoked. He was readmitted to McFarland Mental Health Center (McFarland) in April 2022. Notes from McFarland staff in June 2022 indicate defendant failed to take responsibility for the revocation of his conditional release. He blamed his caseworker, Andy Jolly, for "railroading him." Defendant stated Jolly lied in court. Defendant was "hyper-focused on getting court transcripts and records *** to prove" Jolly lied in court. Dr. Killian saw defendant in August 2022 at McFarland. Defendant did not appear psychotic. Dr. Killian deemed defendant, at that time, not ready for an increase in privileges at McFarland or for conditional release as defendant did not seem "to recognize the role that his own behavior plays in conflicts he has with staff."

¶ 8        Dr. Killian summarized the events of the murder of defendant's "baby." Defendant admitted he smoked crack cocaine the day of the murder and reported seeing people whom "he believed were going to rape his baby and make him watch." Defendant stated he killed his daughter to protect her from them. In a 2015 interview with defendant, defendant told Dr. Killian he had a nervous breakdown at the time of his daughter's death and had been using drugs and stopped taking his medication. Defendant heard voices around the windows.

¶ 9        Dr. Killian reported defendant, after his conditional release was revoked, failed to take responsibility for the revocation. According to McFarland staff, defendant consistently blamed Jolly. McFarland staff further wrote, in June 2022, defendant "took his medications as prescribed, had a stable mood, was not paranoid, and did not appear to be delusional." It was further noted defendant had "staff supervision privileges (a pretty low privilege level)" and had his phone calls restricted to once a month, as he had been contacting the public defender's office excessively—at times "ranting and demanding to speak to his attorney ***, sometimes up to eight times per day." A November 2022 progress report from Elgin MHC indicates staff believed

defendant did not have a feasible plan for reintegration and would benefit from continued treatment. Staff reported defendant had minimal insight into the relationship between his mental illness and substance use.

¶ 10 After Dr. Killian asked defendant in 2023 about the death of his daughter, defendant "was tearful" and stated, " '[T]hey say I killed my daughter, only 18 months old, had nervous breakdown, tried to go to police.' " Defendant told Dr. Killian he was not using drugs at the time. Defendant awoke outside. Defendant stated he was told he hit his daughter with a baseball bat. Defendant stated, " 'I don't believe that but I guess it's true; it's terrible to lose a child and to do that by your own hand is worse.' " Defendant reported giving money to his church and St. Jude Children's Research Hospital. Defendant stated he broke the windows in his house and heard voices everywhere. Defendant said he took his medications and did so while on conditional release. Defendant reported he had a mental illness, schizoaffective bipolar disorder, and had no symptoms since he began taking his medication. Defendant did not believe drugs caused the "voices," as they continued when he was not on drugs. Defendant told Dr. Killian his US Insulation bosses may have caused him to hear voices, as "he took some very big jobs from them." Defendant believed US Insulation may be leaving him alone, as he was locked up in a hospital. When Dr. Killian asked if he believed they would come after him if he was released, defendant stated, " 'I don't know what they would do; I don't know if they can make the voices come back as long as I take my medication.' "

¶ 11 Regarding defendant's statements about Jolly, Dr. Killian reported defendant sent him documents to prove Jolly lied about him in court. Dr. Killian acknowledged Jolly may have misspoken:

"The outpatient notes from 2021 appear to show that he met with

Andy Jolly at least twice between June and December 2021 and also spoke by phone with Mr. Jolly twice. The court transcript shows Andy Jolly saying he only met with Mr. Meece once, that being in September 2021 (*i.e.*, there may be a grain of truth in what [defendant] claims though that does NOT mean that Mr. Jolly was lying, only that he may have misspoken)."

¶ 12    Dr. Killian described defendant as alert, pleasant, and cooperative during the interview. Defendant described his mood as sad. Defendant's "affect was appropriate and appropriately variable, including crying when talking about" his daughter's death. Defendant's

"thought process was coherent and goal directed without loose associations or flight of ideas, but he did frequently go on tangents, largely focused on trying to convince me how well he was doing while he was on conditional release and why he should be placed back out on conditional release."

Defendant did not have suicidal or assaultive ideas. He appeared not to have psychotic symptoms, except possible delusions regarding US Insulation. Defendant's best diagnosis is schizoaffective disorder. The Axis I diagnosis is "schizoaffective disorder, multiple episodes, in partial remission." Dr. Killian observed the schizoaffective disorder appeared to be mostly in remission but noted defendant voiced "some probably mild delusional thinking about US Insulation." Defendant was taking antipsychotic medication, a mood stabilizer, and an antidepressant; the combination appeared to be effective. Defendant did not report any side effects from his current medications.

¶ 13    Dr. Killian opined if defendant stopped taking his medications, he would most

likely "start developing psychotic symptoms within the first couple of months after stopping his medications." In addition, Dr. Killian opined if defendant returned to cocaine, "he would probably become psychotic shortly afterward." Dr. Killian made the following risk assessment of defendant:

> "[W]hile [defendant] does not appear to be currently at significant risk of harming others, his long-term risk is significant in light of his schizoaffective disorder, his history of cocaine abuse, and his somewhat limited insight. Although he clearly acknowledges the murder of his daughter, he engages in a lot of minimization regarding the seriousness of his psychiatric illness and the seriousness of his drug abuse, and he accepts no responsibility for him being re-hospitalized during his conditional release."

The evaluation concludes:

> "It is my opinion, within a reasonable degree of psychiatric certainty, that [defendant] is NOT appropriate at this point for a conditional release because he does not appear to recognize the role that his own behavior and actions played in the revocation of his conditional release in 2021, continuing to blame others for the revocation of his conditional release. I did however note some improvement in [defendant's] delusion regarding US Insulation's role in his daughter's death."

¶ 14 The first to testify for defendant was Andrew Joseph Real. Real testified defendant arrived at the Elgin MHC around 2011. Real met defendant at an Alcoholics

Anonymous (AA) meeting. Real and defendant interacted regularly. They saw each other at Tuesday night meetings. Real visited defendant on Saturdays. At one time, Real was defendant's AA sponsor. The hospital was closed due to COVID-19 in March 2020. "[T]he hospital just let us back in *** around April, maybe late March." Before the reopening "and since he left Elgin," Real had phone contact with defendant. Real testified defendant attended meetings and did as much as he could there. He participated. Real testified he would continue to act as defendant's sponsor if defendant were granted conditional release. Their circumstances would return to "like before he went to Springfield." Defendant had become a friend.

¶ 15        Defendant next called Charles Rivers, a friend. Rivers, who worked at a facility helping individuals suffering from brain injuries, fetal alcohol syndrome, anxiety, and so on, met defendant while Rivers worked as a pharmacist in Springfield. Defendant obtained his medications from the pharmacy where Rivers worked. At times, when defendant would not have a good day, he would go to the pharmacy to talk to Rivers. Rivers would sit with him to check on his well-being, giving him encouraging words and help as much as he could to get defendant through the day. The interactions seemed to work. Defendant would smile and go about his day. Rivers saw defendant help others, like assisting with the groceries, even though defendant could barely walk. Defendant helped Rivers with his car. Rivers said defendant was more like a brother to him than a friend. Their relationship continued after Rivers left the pharmacy. They talked four to five days a week. Rivers testified he would continue as a friend and support defendant. Rivers wanted to get defendant into an outpatient program at Centerstone and said defendant could live with him.

¶ 16        Theodore Meredith, defendant's uncle, testified he talked to defendant every day. When defendant was younger, Meredith only saw defendant once a month. There was a time

when defendant resided with his girlfriend, and the two went "probably two years" without seeing defendant. The two developed a closer relationship. Meredith believed defendant should be released with an ankle monitor and curfew, as jail was not doing him any good. Meredith testified the relationship would continue regardless of whether defendant was released.

¶ 17 Defendant testified on his own behalf. He resided in the Elgin MHC in a mental illness substance abuse program. Defendant had a history of alcoholism. He acknowledged using drugs a few times but stated he was a drinker. Defendant spoke of his one incident of using cocaine while on conditional release in Springfield, Illinois:

> "When I was out there, I had keys to the Easy Does It Club, which is a[n] alcohol facility. But all of the facilities got closed down due to Covid, and we [were] the last one opened. So, when Covid [occurred], they had to clean the whole place out. We didn't go to meetings for a while, and I don't know how to use a computer or anything. And I made a major mistake. I didn't start drinking because that was my worst problem, was hope. I was proud of myself on that fact that I haven't touched a drop to this day for over 14 years. But Tim Ferguson—and I had use of cocaine and told my medical doctor right away on the fact that I made a mistake."

Defendant immediately told his doctor. His doctor could not believe this occurred, as defendant attended every doctor's appointment and stayed on his medication. Defendant also had a beautiful apartment and did not commit any crimes. Defendant was committed to the 12-step program of AA, which was why he reported it to his doctor.

¶ 18    Defendant testified he was diagnosed with schizoaffective/bipolar disorder. Defendant hears and sees things if he is not on his medication. Defendant was in a mental-illness group. Together they watched movies and discussed medication.

¶ 19    According to defendant, his dosage was increased after he "said something" in response to an agent telling others about defendant's crime. Defendant testified that:

> "I wasn't in the right frame of mind, that's for sure. I remember being woke up that morning, and she asked me what was the matter with my eyes[.] I told her I don't know baby. Please don't leave me. That was the last thing I remembered. I was outside. All the windows were broke out. Said I broke every window out of the house. I just went crazy."

Defendant would "never quit taking" his medications in order to prevent something like that from occurring.

¶ 20    Defendant described his physical health. He had "an ankle fusion" because he "fell" and "broke—lost [his] ankle" due to a workplace injury, and he had a steel rod from his right kneecap to his foot. Defendant had trouble getting around. While on conditional release, defendant lived on Social Security and a small disability pension. He attended regular counseling.

¶ 21    Defendant stated he took responsibility for his mistake:

> "I was up at the hospital every day. I kind of slipped going to meetings. But Tim Ferguson was dying of cancer. That was the man I went fishing with, grocery shopping with. I spent almost every day for two months in the hospital until he died with cancer.

I was lost without him alive."

Defendant went to church with Ferguson. Defendant was a member of Restoration Church in Springfield for a year and a half. The pastor was supposed to be there to testify for defendant. Defendant wanted to move to Carbondale with Rivers. Defendant had been out for almost three years. He was still haunted by his daughter's death.

¶ 22　　Defendant testified he never missed a dose of medicine. Sometimes, when his medications came in early, Rivers would call him and tell him they were available.

¶ 23　　On cross-examination, defendant testified he resided in the same apartment in Springfield while on conditional release. The State asked defendant to explain the cocaine use. Defendant responded as follows:

"There was a female that I knew, known, and she never done it around me before. But she come up one time, and she asked if she could. And I was, like, shocked of her. I told her, no, I didn't want any. But then when she blew it in my mouth, we did a little bit. And then we did a couple other things.

\*\*\*

We had sex."

The State asked how defendant met this woman. Defendant and a friend threw a party in the courtyard of Near North. The party had no alcohol or drugs, just food and about 40 others who gathered. Defendant contributed with extra money he received for food during the COVID-19 pandemic. They continued to have this party about once a month. During these cookouts, he met the woman.

¶ 24　　Defendant stated his conditional release was revoked after "Andy Jolly told Judge

Costigan that [he] moved without notifying him." Defendant stated this was a lie as he resided in the same apartment building the entire time. Defendant admitted to a dirty drop. Jolly stated defendant was missing his appointments, and he had disappeared for four months. But defendant stated he had Jolly's notes showing defendant called Jolly and spoke to him. Defendant testified regarding Jolly and the revocation of his conditional release:

> "Andy Jolly told Judge Costigan that I moved without notifying him. That was honest to God lie, because I was still in the same apartment building. He also said that I had a dirty drop. And I asked him be presented to it. And they never presented it in court. But as an honest man as I am, I admitted to it. And the other thing he said is I was missing all the appointments. I disappeared were his exact words. Judge Costigan said you disappeared off radar for four months, and nobody knew where you was at. That's what he told him. I have Andy Jolly's notes showing that I was calling him and talking to him. And on December 27th—the warrant was issued on December 6th. On December 27th, I talked to Andy Jolly on the phone, and he acted like there was nothing matter. Then he says he knew there was a warrant for me but didn't even tell me that there was a warrant for my arrest. He knew I was in my apartment. So, he acted like there was no warrant or nothing. I don't know why he didn't tell me there was a warrant for my arrest. Three different things that Andy Jolly was not honest about. I wouldn't call it a lie, but he didn't tell the judge the truth. And I

feel that's a disgrace to him to talk to the judge, because the judge

believed, trusted in this man for what his words are as a counselor.

Then they threw me back in here. That scared me even more

because there was too much things happening that was funny with

Andy Jolly. His wife committed suicide two months before I got

out. But he's supposed to be responsible for us, for our safety and

safety of others. But he wasn't safety for his own wife. But then he

resigned soon as he threw me back in. I don't understand what's

going on. And everybody's asking how did your wife die and why?

They wanted to know. Everybody wants to know. They just didn't

think—it was strange that she died all the sudden."

¶ 25     When asked if he agreed with the diagnoses of schizoaffective/bipolar disorder, defendant stated he was not a medical doctor, but he did what he was told. Defendant knew he was seeing and hearing things. But since he was taking the medication, he had not seen or heard things.

¶ 26     Regarding Dr. Killian, defendant said he was scared of him. After his 2015 release, Dr. Killian had "one page" for his report. No one gave him information regarding defendant's time while on release.

¶ 27     Defendant gave the following response about OS Insulation:"Bob and Nick Barsella (phonetic), and Patrick Joseph Harold." Defendant explained his concerns regarding OS Insulation, for which defendant had worked for 19 years:

"One of the reasons I say that is because they wouldn't supply us

equipment wherever we went. I felt I had to use a broken ladder to

try to get this job done. I fell, and I broke my ankle. I ended up with a[n] ankle fusion. I went through five surgeries for three years. I set you up with that really good lawyer, which was a lawyer here in Bloomington. I don't want you to use his name right now. But he said, oh—he goes, I'll take good care of you. This is a serious injury. We'll get you all kinds of money. He called me in his office. Now, this is Bob's and P.J.'s lawyer, and he says we didn't file on time, so you're going to have to take [$]30,000 out of pocket. I got no insurance for my leg. I'm paying all this money out of pocket for my injury. Every time I got to get a cortisone shot, or shoes I wear out real quick only last three months. So, yeah, I one time wadded up [an] American flag and threw in your house. I was mad because I don't like our flag treated like that. He goes, I said what did you do that for? And he goes because I just gave the wrong books to the auditor, [defendant]. So, yeah, there was corruption in this company. That's why I quit and started my own business. And the name of the business was American Insulation. We did quite a few jobs in Bloomington/Normal and all the way to Champaign and Peoria. I was proud of myself and my business. And then one day, Associated Contractors called me up and said, hey, [defendant], we want you to come meet Bob. They're the only union insulation company around here. So, I said, okay. So, I gave a bid on a couple jobs. I was at the shop late one

day and Bob pulled up. He raised prices 22, 25 percent. I said,
why? He goes just do it, [defendant]. I said I'm making money.
Not raising my prices. And he interrupted and said not enough
return of two union insulation companies. I said, I'm staying there,
Bob. They came to me and asked me to start the company. He got
mad. Blew through a red light. That's where all my troubles started
happening. That was about 2006, 2005. My crime happened in
2009."

When asked if he had ongoing concerns about that company, he said he did not believe so. His concern was he was "getting old now." Defendant said he was 61 and his "legs are going." He wanted to "do some more things before" he was "in a wheelchair." If the company had given him equipment, he would not have been injured as he was.

¶ 28       Defendant averred, if released, he would take medication as prescribed, as he had never stopped taking it. He stated he was haunted by the death of his daughter.

¶ 29       Defendant also presented documentary evidence. He submitted a certificate, dated May 2023, for completion of "dual diagnosis group and alcohol and drug effects group." He also submitted evidence showing financial contributions to St. Jude Children's Research Hospital and his church and a letter from a friend.

¶ 30       The trial court entered an oral ruling denying defendant conditional release, finding defendant failed to meet his burden of showing by clear and convincing evidence he is not reasonably expected to inflict harm on himself or others or he would not benefit from further inpatient care. After summarizing the evidence in the case, the court began by finding defendant "continues to minimize his actions and the issues that led to his revocation." The court found it

concerning, "when asked about the death of his daughter it was couched in terms as an incident rather than a murder, a killing of his daughter because counsel recognized that it would upset [defendant]." However, the court further noted Dr. Killian's report indicated defendant had some understanding of the gravity of that offense as, in the most recent interview, defendant cried and became upset when recounting the day of the murder. The court emphasized the fact the staff at the Elgin MHC did not yet trust defendant to leave the building unsupervised. The court noted some improvement in defendant's mental health, so long as defendant continued to manage his medication and treatment. The court noted the continued minimization and blaming others for the issues that led to his most recent hospitalization.

¶ 31    The trial court further noted Dr. Killian's finding, while defendant was making some progress, if he stopped taking his medication, it was not clear how quickly symptoms of his psychotic illness would return. According to the court, most likely such symptoms would develop "within the first couple of months after stopping his medications." Due to defendant's "significant history of alcohol and cocaine abuse," that fact is significant, as drug use appears to have had a "significant role in worsening his psychiatric symptoms which in turn led to [defendant] murdering his daughter in 2009." The court stressed Dr. Killian's conclusion if defendant used cocaine again, "he would probably become psychotic shortly afterwards."

¶ 32    The trial court further emphasized defendant continued to blame his attorney and Jolly, his former counselor, and took little to no accountability as to his actions.

¶ 33    This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, defendant argues the trial court's ruling is against the manifest weight of the evidence. Defendant contends, contrary to the court's findings, he recognizes the

- 15 -

seriousness of his daughter's death, as evident by his accepting responsibility for her death and the fact was haunted by her death. Defendant contends he is not a danger to the community. He stresses his schizoaffective disorder is mostly in remission, he always takes his medication, and he experiences no side effects from his medication. Defendant further acknowledges his history of alcohol and substance abuse and asserts he will be vigilant in maintaining his sobriety.

¶ 36    After an acquittal by reason of insanity, a defendant seeking conditional release bears the burden of proving he is entitled to that release by clear and convincing evidence. See 730 ILCS 5/5-2-4(a), (g) (West 2022). A defendant may meet this burden by showing, although in need of mental-health services, he is not in need of mental health on an inpatient basis. *Id.* § 5-2-4(a). The statute defines " '[i]n need of mental health services on an inpatient basis' " as "a defendant who has been found not guilty by reason of insanity but who, due to mental illness, is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." *Id.* § 5-2-4(a-1)(B).

¶ 37    The Code provides a list of evidence that may be weighed by a trial court upon a petition for conditional discharge. See *id.* § 5-2-4(g). That evidence may include the following:

"(1) whether the defendant appreciates the harm caused by the defendant to others and the community by his or her prior conduct that resulted in the finding of not guilty by reason of insanity;

(2) whether the person appreciates the criminality of conduct similar to the conduct for which he or she was originally charged in this matter;

(3) the current state of the defendant's illness;

- 16 -

(4) what, if any, medications the defendant is taking to control his or her mental illness;

(5) what, if any, adverse physical side effects the medication has on the defendant;

(6) the length of time it would take for the defendant's mental health to deteriorate if the defendant stopped taking prescribed medication;

(7) the defendant's history or potential for alcohol and drug abuse;

(8) the defendant's past criminal history;

(9) any specialized physical or medical needs of the defendant;

(10) any family participation or involvement expected upon release and what is the willingness and ability of the family to participate or be involved;

(11) the defendant's potential to be a danger to himself, herself, or others;

(11.5) a written or oral statement made by the victim; and

(12) any other factor or factors the Court deems appropriate." *Id.*

¶ 38    On review, this court will reverse a trial court's determination regarding a petition for conditional release only if we find the decision to be against the manifest weight of the evidence. *People v. Bryson*, 2018 IL App (4th) 170771, ¶ 66, 115 N.E.3d 362. A decision is

against the manifest weight of the evidence if the opposite conclusion is clearly evident or the determination is arbitrary or unreasonable or is not based on the evidence. *Id.*

¶ 39　　　　　We find the trial court's order is not against the manifest weight of the evidence. The evidence supports the court's findings, in particular defendant's continued minimization of the issues that led to the revocation of his conditional release. For example, for his use of cocaine while on release, defendant directed the blame at the woman who "blew it in [his] mouth." He also pointed to his friend's hospitalization for cancer as the reason he "slipped going to meetings." The inability to take responsibility for his return to confinement, in addition to the fact defendant returned to cocaine while on conditional release, undermines his contention he can and will remain vigilant if released again. Moreover, Dr. Killian and the staff at the Elgin MHC concluded defendant is not ready for conditional release. Given these circumstances and the fact defendant's drug use and failure to stay on his medication worsened his psychiatric symptoms and led to his daughter's death, the court's conclusion defendant failed to prove by clear and convincing evidence he would not be "reasonably expected to inflict serious physical harm upon himself or another" or would not "benefit from inpatient care" or is not " in need of inpatient care" (730 ILCS 5/5-2-4(a-1)(B) (West 2022)) is not arbitrary, unreasonable, or not based on the evidence (*Bryson*, 2018 IL App (4th) 170771, ¶ 66).

¶ 40　　　　　　　　　　　　　　III. CONCLUSION

¶ 41　　　　　We affirm the trial court's judgment.

¶ 42　　　　　Affirmed.